Argued and submitted September 5, 1997, decision of Court of Appeals and
judgment of circuit court affirmed May 20, 1999

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## TRACEY MACK TITUS,
*Petitioner on Review.*

## (CC 93-1324; CA A89485; SC S43817)

982 P2d 1133

Mary M. Reese, Deputy Public Defender, Salem, argued the cause for petitioner on review. With her on the briefs was Sally L. Avera, Public Defender.

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

** Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Kulongoski, J., did not participate in the consideration or decision of this case.

CARSON, C. J.

## CARSON, C. J.

This criminal case presents three questions, each involving evidentiary issues. First, whether, as defendant contends, the trial court erred by excluding evidence suggesting that a state's witness improperly had attempted to influence the trial by threatening a defense witness. Second, whether the trial court improperly admitted certain hearsay evidence. Third, whether the trial court erred when it admitted, over his relevancy objection, evidence of defendant's prior drug use.

As to the first question, we conclude that, although the trial court erred in excluding the evidence of improper conduct of a witness, that error was harmless. We further conclude that defendant's second and third arguments do not require reversal and that a discussion of those assignments would not benefit the bench or bar. Accordingly, we affirm defendant's conviction.

Defendant was arrested and charged with possession and delivery of a controlled substance. At trial, one of the state's witnesses, Bassett, testified that he had helped defendant become a drug dealer and that defendant subsequently had supplied him with drugs.

Defendant sought to lessen the impact of Bassett's testimony by demonstrating that Bassett was biased against him. For example, on cross-examination during the state's case-in-chief, Bassett admitted that he thought that defendant was a "punk" and that he had volunteered to make a controlled purchase of drugs from defendant for the police. He also testified that, after defendant's arrest, he had broken into defendant's apartment and stolen some of defendant's property. Finally, a police officer testified on cross-examination that Bassett had admitted that he was "out to get" defendant.

Defendant claims that, after he presented that impeachment evidence, he discovered that Bassett had threatened a defense witness, Bassett's ex-wife, in an attempt to dissuade her from testifying. Specifically, Bassett allegedly had told his ex-wife that, if she testified for the

defense, Bassett would use that testimony—which would place her in the company of a suspected drug dealer—against her in pending child custody proceedings.

Defense counsel first attempted to introduce evidence of that alleged threat (the "threat evidence") while cross-examining Bassett during the state's case-in-chief. The following exchange took place:

"[Defense Counsel:]   Mr. Bassett, just about a couple of hours ago you were sitting out in the hallway, were you not?

"[Bassett:]   Yes, I was.

"[Defense Counsel:]   And your estranged wife, Gloria Bassett, was out there with you, was she not?

"[Bassett:]   Yes, she was.

"[Defense Counsel:]   And Brenda Aerni was out there, too, wasn't she?

"[Bassett:]   Yes, she was.

"[Defense Counsel:]   Didn't you tell Brenda Aerni that if Gloria Bassett testifies in this case, you're going to use that against her?

"[Bassett:]   No. I made an exact statement that I didn't understand why my wife, who [had] willingly done a controlled buy or attempted a controlled buy on Tracey Titus's house and who was also one of the people who tried to take him down in December of '93, would walk into a courtroom and get up on the stand and testify for him.

"[Defense Counsel:]   The question to you was: Didn't you say to Brenda Aerni that you would use it against her if she testified?

"[Bassett:]   No, I did not. You can't use this court case in my custody case.

"[Defense Counsel:]   All right. You say you did not.

"[Bassett:]   No, I did not.

"[Defense Counsel:]   Didn't you actually tell her, 'Yes, I will use it against you,' when she found out that you had said that to Brenda Aerni?

"[Prosecutor:]   Objection, your Honor. This is asked and answered—

"* * * * *

"[Defense Counsel:] Well, your Honor, I didn't ask him whether he asked his wife this. I intend to have her come in and testify that he did say that to her, so I think I have to ask him that question in order to lay a foundation for her to testify to that."

The state then objected, arguing that the evidence should be excluded because it was offered to impeach on a collateral matter. The court sustained the objection.

During defendant's case-in-chief, defense counsel again offered evidence of Bassett's alleged threat. The defense called Bassett's ex-wife and asked whether Bassett had threatened her in order to dissuade her from testifying. The state again objected, upon the ground that the evidence constituted impeachment on a collateral matter because it was offered merely to contradict Bassett's testimony. Defendant explained that the evidence was not being offered to impeach by contradiction but, rather, to demonstrate Bassett's bias against him. After considering defendant's offer of proof, the trial court sustained the state's objection, concluding that the evidence was not relevant to Bassett's bias against defendant:

"Mr. Bassett's threat, as I understand it, was that if she testifies, he's going to be using that or would use that in a custody case against her.

"I don't see where that shows any bias or interest in—to or against [defendant].

"* * * * *

"Now, you talked about that testimony showing threatened behavior or abusive behavior of Mr. Bassett, and that is simply not impeachable information. I mean, that's not part of this case. That's not relevant to the elements in this case. It is not relevant to the truthfulness of Mr. Bassett. * * * [W]hat you are saying that you want to show by this evidence simply has nothing to do with this case."

The jury convicted defendant of possession and delivery of a controlled substance.

On appeal, defendant assigned error to both rulings excluding the threat evidence. In each assignment, defendant argued that the evidence was relevant to bias, because it had a tendency to prove that Bassett was willing to take improper actions to increase the likelihood of defendant's conviction. The Court of Appeals affirmed the trial court from the bench, *State v. Titus*, 144 Or App 329, 927 P2d 157 (1996), and we allowed defendant's petition for review.

Before this court, defendant first contends that the trial court erred when it prevented defense counsel from asking Bassett, on cross-examination during the state's case-in-chief, if he had threatened his ex-wife. As he did at trial, defendant asserts that, in questioning Bassett about the threat, he intended to lay a foundation for contradictory evidence that he would have introduced later. Defendant's argument on that issue is not well taken.

■■ A witness cannot be cross-examined on a collateral matter if the purpose of that cross-examination merely is to discredit the witness by subsequently *admitting* evidence to contradict the witness's testimony. *Compare State v. Burdge*, 295 Or 1, 6 n 3, 664 P2d 1076 (1983) (a witness may be impeached by evidence that contradicts the witness's testimony on any independently relevant fact). Applying that principle to this case, the trial court properly excluded the evidence, because defense counsel's stated purpose merely was to lay a foundation to contradict Bassett's testimony.

■ Defendant next argues that the trial court erred when it concluded that the testimony of Bassett's ex-wife was not relevant under OEC 401 to demonstrate Bassett's bias against him.[1] OEC 401 defines relevant evidence as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more

---

[1] On review, the state argues that, in addition to holding the evidence to be irrelevant under OEC 401, the trial court "implicitly" determined that the evidence was cumulative and confusing under OEC 403. The record does not support that assertion. Also, we do not consider the state's additional argument that the trial court's exclusion of the evidence was, at most, harmless error, because the evidence would have been excluded as cumulative under OEC 403. Our harmless error analysis on review of a trial court's determination of relevance under OEC 401 does not include discretionary rulings the trial court *could have made* under OEC 403.

probable or less probable than it would be without the evidence." The rule establishes a "very low threshold" for the admission of evidence. *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993). Evidence is relevant so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference. *Hampton*, 317 Or at 255.

■ At the outset, we must determine the appropriate standard of review for trial court determinations of relevance under OEC 401—a question that previously has not been addressed expressly by this court. In considering that question, we note the distinction between the determination of relevance under OEC 401 and the question of admissibility under OEC 403. A decision to exclude evidence under OEC 403 is reserved to the trial court's discretion. *State v. Moore*, 324 Or 396, 407, 927 P2d 1073 (1996); *State v. Hubbard*, 297 Or 789, 798, 688 P2d 1311 (1984). That is so because application of OEC 403 may allow for more than one legally correct outcome. *Hubbard*, 297 Or at 794 n 2. For example, in some cases, the record may support either the admission or exclusion of otherwise admissible evidence under OEC 403, and neither result legally would be incorrect. *See Carter v. Moberly*, 263 Or 193, 201, 501 P2d 1276 (1972) (so stating in a civil case).

■■ Relevance determinations under OEC 401, by contrast, can yield only one correct answer; evidence either is relevant or it is not. Under OEC 401, if evidence logically is relevant, a trial court has no discretion to label it as irrelevant. *See generally* Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, 420 (2d ed 1994) (because determinations of relevance are based upon logic and experience, there is little reason to defer to the trial court). Accordingly, we conclude that we must review determinations of relevance for errors of law.

■ We now apply the foregoing standard of review to this case. Assuming that Bassett did, in fact, threaten a defense witness, it is unclear from the record whether that threat was inspired by his alleged animosity for the witness, for defendant, or both. However, it is indisputable that Bassett's threat, if successful, would have eliminated a

defense witness, thereby possibly increasing the likelihood of defendant's conviction. Thus, although evidence of the threat could have supported more than one theory of bias, the evidence had a tendency to make the existence of bias against defendant more probable than it would have been if the evidence were excluded. It follows that the evidence was relevant under OEC 401. The trial court's conclusion to the contrary was error.

Having concluded that the trial court erred in excluding the threat evidence, we now must determine whether that error requires reversal of defendant's conviction. Evidentiary error is not presumed to be prejudicial. OEC 103(1). An adverse verdict may be affirmed, notwithstanding the evidentiary error, if there is little likelihood that the error affected the verdict. *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987).

As to evidence of bias, in *Hubbard*, this court stated:

> "It is error for the trial judge to exclude evidence which establishes sufficient facts from which the bias or interest of a witness may be inferred. If in the context of the entire trial, the exclusion is prejudicial to the party who sought to introduce the impeachment evidence, it is reversible error."

297 Or at 798. Where, as here, an error results in the exclusion of bias evidence, the specific issue is whether the error denied the jury "an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." *Id.* at 800. Thus, under *Hubbard*, the trial court's error in this case would be harmless if either: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess Bassett's credibility; or (2) Bassett's credibility was not important to the outcome of the trial.

We first consider whether the jury had an adequate opportunity to assess Bassett's credibility. The jury already had heard substantial evidence of Bassett's bias when the threat evidence was excluded. In addition to the previously discussed impeachment evidence, defendant also presented testimony from Bassett's ex-wife that Bassett hated defendant and wanted to "get" defendant "busted." However, that

evidence, at the most, established only that Bassett was hostile toward defendant. If that had been the only evidence admitted, then the jury might have believed that, despite his ill feelings toward defendant, Bassett nonetheless had obeyed the law and testified honestly. By contrast, the threat evidence might have suggested that Bassett was willing to act unlawfully based upon his feelings toward defendant in order to undermine the fairness of defendant's trial. In other words, the jury might have concluded that, if Bassett unlawfully had threatened a defense witness, he also would have had no compunction about lying under oath. Thus, the threat evidence could have informed the jury's credibility assessment of Bassett in a way that the evidence of Bassett's ill feelings might not have.

We think it significant that the threat evidence demonstrated an attempt by Bassett to undermine the legal proceeding itself. In our view, that suggests bias qualitatively different in nature from that suggested by the evidence of Bassett's ill feelings toward defendant. Thus, we cannot conclude that the jury had an adequate opportunity to assess Bassett's credibility absent consideration of evidence of Bassett's alleged threat.

Next, we consider whether Bassett's credibility was important to the outcome of the trial. "If numerous other witnesses testified to a given fact, then the exclusion of evidence of a witness' bias or interest who testified to the same fact might be 'harmless error' in the context of a given trial." *Hubbard*, 297 Or at 800. However, such an error would not be harmless "where the impeached witness is the sole witness on a given issue and there is no corroborating evidence." *Id.* at 800-01. We begin by reviewing the evidence presented against defendant.

Defendant was charged with possession and delivery of a controlled substance on or about December 3, 1993. Because both parties presented evidence relating to events several months before his arrest, the trial court ruled that defendant could be convicted based upon any facts alleged to have occurred between March 1 and December 9, 1993.

The state's first two witnesses were police officers: Officer Woodruff, a City of Tillamook police officer, and

Detective Nafziger, an Oregon State Police detective specializing in narcotics. Woodruff testified that Aerni, a friend and former roommate of defendant's, had told Woodruff that she had obtained methamphetamine from defendant and that defendant was the primary drug dealer in her town. Woodruff testified that, on December 3, 1993, he went to defendant's apartment to investigate a report that defendant had drugs in his apartment and unlawfully possessed a firearm. According to Woodruff, when he arrived at defendant's apartment, defendant was wearing a coat, which defendant took off and set down on a piece of furniture in the apartment. Nafziger and another officer then arrived and searched defendant's apartment with defendant's consent. Nafziger found several syringes, some used, in a drawer in defendant's bedroom. Nafziger also found nine one-quarter gram bags of methamphetamine in the pocket of defendant's jacket. Although defendant admitted that he had worn the jacket for several hours before the search, he denied any knowledge of the methamphetamine and claimed that someone must have put it there in an effort to frame him. Defendant later presented evidence that Bassett had possession of the jacket for some period during the week before defendant's arrest. Defendant also denied any knowledge of the syringes in his bedroom.

Next, Nafziger testified that he had seen what he believed to be needle marks on defendant's arm. Defendant offered no explanation for the marks at the time but, at trial, suggested that perhaps there was a rash on his arm from working with fiberglass.

Nafziger also testified that, at the time of his arrest, defendant had $1,768 in cash in his wallet, and his checkbook recorded recent balances at least as high as $8,000—despite the fact that he had been unemployed for several months. Defendant explained that those balances were attributable to his recent receipt of inheritance income. Finally, Nafziger testified that defendant had admitted selling a $20 bag of methamphetamine on behalf of his roommate. According to Nafziger, defendant then recanted, stating that he had not delivered the drugs himself, but merely had taken the money for his roommate, who earlier had delivered the drugs.

Bassett was the state's third witness. He testified that he had helped defendant find a drug supplier so that defendant could operate as a drug dealer. He also testified that he had purchased drugs from and used drugs with defendant during the period from June 1993 until defendant's arrest in December 1993.

The state's fourth witness was Aerni, who testified to the following: Bassett had obtained his methamphetamine from defendant; defendant was selling drugs for a living when she met him; and, while living with defendant for several months before his arrest, she had observed him selling drugs and had accompanied him on trips to buy as much as three ounces of methamphetamine. According to Aerni, defendant bought and sold six to eight ounces of methamphetamine each week and divided that amount into one-quarter gram bags. She claimed that defendant often paid more than $800 for an ounce of methamphetamine and typically more than doubled his investment by reselling the one-quarter gram bags. Finally, Aerni testified that defendant had injected methamphetamine on December 2, 1993, the day before his early morning arrest, and that, several hours before his arrest, defendant had stated that his drug supply was low and that he planned to buy two more ounces that night.

Bassett's testimony contains only two statements that conceivably could have contributed to defendant's conviction. First, Bassett testified that he had helped defendant find a drug supplier so that defendant could operate as a drug dealer. That testimony, however, would not by itself have supported defendant's conviction—it merely invited an inference that defendant at some point possessed and delivered illegal drugs. In light of the evidence just discussed, that testimony was unlikely to have affected the outcome of defendant's trial.

Second, Bassett testified that he regularly purchased drugs from defendant during the period from June or July 1993 through December 1993. That testimony is significant, because it independently could have supported defendant's conviction. It follows that the risk of prejudice from the

erroneous exclusion of impeachment evidence against Bassett was significant.

However, Bassett was only one of four witnesses called by the state, and neither of the charges against defendant were supported solely by his testimony. Three other witnesses testified that defendant regularly had possessed and delivered drugs between March 1 and December 3, 1993. It also is significant that drugs were found in defendant's jacket at the time of his arrest. Finally, defendant's hasty admission to Nafziger that he had participated in a drug sale, although quickly retracted, also could have supported defendant's conviction.

It also is significant that other witnesses corroborated Bassett's testimony that he had bought drugs from and used drugs with defendant. First, Woodruff testified that Aerni had told him that defendant was the drug dealer in town and that she regularly had bought methamphetamine from him. Second, Aerni testified that she and Bassett had obtained drugs from defendant and regularly had used the drugs together.

Based upon that independent evidence of defendant's guilt and the testimony corroborating Bassett's allegations, we conclude that the erroneous exclusion of the impeachment evidence concerning Bassett was not likely to have affected the outcome of this case below. It follows that the trial court's error was harmless. *Compare Hubbard*, 297 Or at 802 (exclusion not harmless error when no additional testimony supported defendant's conviction).

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.