Argued and submitted September 29, 2015, affirmed June 22, petition for review denied October 6, 2016 (360 Or 423)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## SHAUN PATRICK THOMAS,
*Defendant-Appellant.*

Columbia County Circuit Court
071336; A156080

379 P3d 731

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

## DEVORE, J.

Defendant appeals a judgment convicting him of four counts of sodomy in the first degree, ORS 163.405, and four counts of sexual abuse in the first degree, ORS 163.427. As to the first two assignments of error, we conclude, for different reasons, that the court did not err in limiting the testimony of defendant's experts. We reject defendant's third and fourth assignments of error without discussion. And, we affirm.

Defendant first assigns error to the trial court's limitation on testimony from a professor of psychology about research studies involving children's memories of a medical procedure requiring the manipulation of their genitalia. The trial court ruled that the details of the studies were inadmissible hearsay and excluded them on that basis. We affirm that ruling, for the reasons that will follow.

Defendant next assigns error to the court's limitation on the testimony of a clinical psychologist who reviewed an agency's interview with the victim, opined that the interview was conducted appropriately, but would have faulted the agency's investigator for lack of follow up, suggesting that the interviewer may have been biased in favor of the victim's mother. The trial court, recognizing that the agency investigator freely admitted the lack of follow up on cross-examination, disallowed as irrelevant the psychologist's testimony about the lack of follow up. We affirm the ruling but for a different reason.

## FACTS

We summarize the facts leading to defendant's conviction consistently with the jury's verdict. *State v. Nistler*, 268 Or App 470, 472, 342 P3d 1035, *rev den*, 357 Or 551 (2015). Defendant was convicted for sexual contact with his nephew, ZM, beginning some time after the child was seven or eight years old. Defendant is the brother of ZM's mother, Crosby. Defendant lived with Crosby off and on throughout most of ZM's childhood—in time periods ranging from one night to six months. When defendant was not staying with Crosby, he lived out of a backpack and carried a sleeping bag

and items he needed on the road. When defendant stayed with Crosby, he frequently watched ZM and ZM's siblings.

ZM's parents, Crosby and Marin, separated. When ZM was 14 years old and was staying with Marin, ZM revealed to Marin that defendant had sexually abused him. Marin told Crosby. When Crosby asked, ZM told Crosby that defendant had been inappropriate with him. Crosby contacted the police. Her report prompted an evaluation by the Amani Center, a child abuse assessment center. During an interview, ZM repeated that defendant had sexually abused him.

At trial, ZM testified that he did not remember how old he was when defendant began to sexually abuse him. He testified that the abuse happened "[a]lmost anywhere," but often it would occur when defendant forced him to get into defendant's sleeping bag. ZM recounted that defendant would touch ZM's penis and force ZM to touch defendant's penis. ZM said that defendant would often hold ZM down, while ZM fought to get up, and place his penis inside ZM's bottom. ZM estimated that defendant touched ZM's penis at least four times and "held [him] down and pushed his penis inside of [ZM's] bottom" at least three times. ZM did not remember all of the details of the abuse, such as the location of each incident, but he testified that the abuse happened "[t]oo often" when he was a child. ZM did not remember when defendant stopped sexually abusing him. ZM was afraid to tell anyone about the abuse because defendant had threatened him.

ZM's sisters, CM and JK, testified that, while they were growing up, defendant frequently watched the children. The sisters remembered defendant separating ZM from the girls for "punishment," leaving defendant alone with ZM. JK testified that, on one occasion, defendant sent the girls to their room, and she heard ZM crying. JK left the room to see why ZM was crying and saw ZM with defendant in defendant's sleeping bag. Defendant saw her and yelled at her to get back in the room and close the door.

At trial, the defense's theory of the case was that ZM's parents had biased him and had planted a false memory of defendant abusing him. To that end, defendant offered

evidence that Marin was a poor father figure, often used drugs in front of the children, and shared pornography with his son when he was 12 years old. Marin and defendant did not get along well, and when they disagreed, Marin called defendant derogatory names that referred to his sexual orientation.

The defense contended that the Amani Center, the agency that had investigated the abuse allegation, was biased against defendant and biased in favor of Crosby. The contention, in defendant's view, was supported by the failure of the agency to investigate the mother when ZM remarked, during the interview, that Crosby was physically abusive to him on a few occasions. The investigator had doubted the validity of ZM's remarks.

## EVIDENCE FROM STUDIES

As noted, defendant first assigns error to a limitation on the testimony of his first expert. Defendant offered testimony from Dr. Daniel Reisberg, a professor of psychology, in order to show "how false memories are created" and how "traumatic events are memorialized and remembered." The state filed a motion *in limine* to restrict that testimony and requested a Rule 104 hearing to determine admissibility. At the Rule 104 hearing, Reisberg testified that his expertise included the "science of the way traumatic events are remembered in children." He was asked whether there have been studies about the way traumatic events are remembered, and he answered affirmatively, describing the ways that memory is studied.

After identifying studies generally, including studies on how children remember trips to the emergency room, Reisberg testified that "[a] number of people have studied childrens' memories for what I think may be most useful for the court, medical procedures in which the child has had his or her genitals closely examined and manipulated." Defendant's counsel then asked Reisberg to "tell the court more about that last area of study, the medical procedures, sort of the studies that you're familiar with and the way— more of the details about the way they were conducted." Reisberg explained that there were "five or six or seven studies that have specifically examined cases in which children

had to undergo, for medical reasons, a procedure called a voiding cystourethrogram [VCUG]." In the course of the VCUG procedure, a dye is injected through a child's urethra into the bladder, which is then x-rayed. Reisberg described the procedure as

> "involv[ing] the child being stripped naked, exposing his or her genitals to a crowd of three or four or five strangers * * * all of whom are intently staring at the child's genitals, a medical professional manipulating the child's genitals and inserting a small tube into them, injecting fluid."

Reisberg testified that researchers later interviewed a group of children who had undergone the procedure, and they found that, with the exception of children under the age of three, children tend to remember the procedure "extremely well," including specific details of "the sequence of events, * * * roughly how many people were in the room, * * * how they had to disrobe, * * * specific instructions that they were given, [and] * * * what hospital they were taken to."

In seeking to limit Reisberg's testimony, the state contended that he could rely on the VCUG study to form an opinion but that "it doesn't mean that that's a fact or vehicle to get all of the [inadmissible] hearsay in before the jury." Defendant disagreed, reasoning that OEC 703 "allows Dr. Reisberg to talk about otherwise inadmissible hearsay, including the data and the specific method of the VCUG studies."

The trial court agreed with the state, questioning the "importance of going into the details of the specific study," considering that Reisberg was offering an opinion on the memory of trauma generally and was not offering an opinion about ZM's memory of the alleged abuse.[1] The court ruled that Reisberg could not "specifically discuss the medical procedure of the genital inspection. He can just generally indicate that there are intrusive medical procedures that children have been—have received that resulted

---

[1] The trial court stated, "It seems to me is what you're saying is that you're wanting to argue that had it occurred he would have more vivid memories of the events than were offered at trial." Defense counsel responded that, although that was a permissible argument to the jury, it was "not something that I would have Dr. Reisberg testify about."

in their having significant memories that would over time then somewhat dissipate." Although defendant continued to argue that the particulars of the VCUG studies formed the basis of Reisberg's opinion, the court expressed confusion as to "what that opinion would be." Defense counsel then reiterated that "the opinion is that traumatic events, as we've discussed, you've already *ruled is admissible,* that traumatic events are remembered clearly and with detail over time."

Defendant later clarified that

> "the analysis is more correctly that [Reisberg] is presenting to the jury his opinion as an expert witness about the science of the memory of trauma, traumatic memory, and so, you know, it's incorrect to frame it as a hearsay analysis. We're in no way, you know, arguing that, you know, the relevant issue is the VCUG study. * * * *Rather it's [Reisberg's] presentation of it and the jury can evaluate his presentation of it*[.]"

(Emphasis added.)

The trial court rejected that argument, again explaining that defendant had not tied the details of the VCUG studies to any opinion that Reisberg was going to offer; rather, defendant was using the studies as "direct evidence that when your genitals are touched you should remember it in great detail." The court further explained:

> "I think it's inadmissible hearsay and there's no basis for it to come in under the current—under the current setting because this witness is not going to be able to offer an opinion as to the validity of the memories of the witness.
>
> "He's going to be testifying as to the basics of memory and how, when things traumatic happen to us, we tend to have better memories * * *."

At trial, in accordance with that ruling, Reisberg testified about the effect of traumatic events generally, but he did not discuss the details of the VCUG studies. Reisberg told the jury that there were psychological studies of children who have suffered traumatic events, which the children described as frightening or embarrassing. He explained that when children suffer trauma, like invasive medical procedures, "they tend to remember it very well for a very long

time." Emotion and trauma, he said, "helps you to remember more for a longer time across the board." He added that, "the percentage of children who remember repeated trauma is quite high." Even eight to 12 years later, he said, "there is still a good (inaudible) memory."

On appeal, defendant assigns error to the trial court's limitation of Reisberg's testimony, arguing that the court erred in excluding the details of the VCUG studies on hearsay grounds. According to defendant, a description of the VCUG procedure in the studies was admissible because it "served as a basis for [Reisberg's] expert opinion" under OEC 703, which provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Defendant acknowledges that OEC 703 does not itself authorize the admission of otherwise inadmissible evidence. *See McCathern v. Toyota Motor Corp.*, 332 Or 59, 70, 23 P3d 320 (2001) ("OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion."); *Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 153, 20 P3d 837 (2001) ("[A]lthough an expert may *base* his or her opinion on inadmissible facts and data of the type reasonably relied on by experts in a particular field, '[n]othing in OEC 703 suggests that otherwise inadmissible evidence is admissible simply because it was the basis for the expert's opinion.'" (Quoting *Stevens v. Horton*, 161 Or App 454, 465, 984 P2d 868 (1999) (emphasis in original).)); *Mission Ins. Co. v. Wallace Security Agy., Inc.*, 84 Or App 525, 528, 734 P2d 405 (1987) (Although OEC 703 "recognize[s] that experts often rely on facts and data supplied by third parties," the rule "does not give *carte blanche* to admitting otherwise inadmissible hearsay."). He also implicitly acknowledges that the details of the VCUG studies, if offered for their truth, would be inadmissible as hearsay. *See* OEC 801(3) (defining hearsay as "a statement, other than one made by the declarant while testifying at

the trial or hearing, offered in evidence to prove the truth of the matter asserted"); OEC 802 (providing that hearsay is not admissible except as provided in OEC 801 to OEC 806). But, he argues, because his expert was permitted to rely on the studies under OEC 703, evidence of the studies can be admitted for a purpose other than their truth—namely, to allow the jury to assess the foundation for Reisberg's opinion.

Defendant relies heavily on the Supreme Court's decision in *McCathern*. In that case, the plaintiff offered testimony from several expert witnesses to establish that the 1994 Toyota 4Runner was designed defectively, making it prone to rollovers. One expert witness, an accident reconstructionist, studied similar accidents and reached his opinion "based on information that he had reviewed from lawsuits or investigation reports involving those incidents, including police reports, police photographs, and witness depositions. In some of the cases, [the expert] actually had visited the accident scene or had examined the vehicle involved in the accident." 332 Or at 67. The trial court allowed the expert to "give a brief summary of each accident for the jury and then to offer his opinion whether each accident was 'substantially similar' to plaintiff's accident based on the criteria that he had identified." *Id*. Toyota argued that the court erred in that regard, because the information in the reports was hearsay.

The Supreme Court began its analysis by noting the principle, set forth above, that "OEC 703 does not render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion." *Id*. at 70. The court then held:

> "Nevertheless, we hold that the trial court did not err when it overruled Toyota's hearsay objections, because plaintiff offered the evidence of the details surrounding the 15 other rollover accidents *only to provide the foundation necessary to explain* [the expert's] *opinions, not for its truth. The trial court admitted the evidence solely for that purpose. Consequently, by definition, that information was not 'hearsay.'* See OEC 801(3) ('hearsay' is out-of-court statement offered to prove truth of matter asserted); *see also Oberg v. Honda Motor Co.*, 316 Or 263, 269-70, 851 P2d 1084 (1993) (excerpts of documents read to jury admitted for limited

purpose that defendants had notice of defective design and not for truth were not hearsay), *rev'd on other grounds sub nom Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994)."

332 Or at 70-71 (emphasis added).

Defendant argues that this case is analogous to *McCathern*, because the details of the VCUG studies were offered to allow the jury to assess the foundation of Reisberg's opinion, not for their truth. However, we are not persuaded that admission of the details of the VCUG studies would have served the same nonhearsay purpose that the court recognized in *McCathern*.

In this case, the details of the VCUG process or studies would not have helped explain or provide the necessary foundation for any opinion that Reisberg was actually asked to offer. At the Rule 104 hearing, Reisberg opined generally on how traumatic events are clearly remembered by children. He was never asked to offer his own opinion on how children would remember the details of medical procedures involving their genitals compared to other types of trauma. Nor was he asked to draw any of his own conclusions that were based on the description of the VCUG procedure itself. When pressed on the subject, defense counsel did not identify an *opinion* that would be based on the VCUG procedure. Instead, defense counsel stated that the relevant issue was "Dr. Reisberg's presentation of [the VCUG study] and the jury can evaluate his presentation of it."

In that circumstance, the details of the studies were not offered on direct examination as necessary to explain Reisberg's opinion or to aid the jury in evaluating the quality of his reasoning with regard to his opinion.[2] Instead, the

___

[2] In this case, we need not decide if the limit of an expert's explanation, on direct examination, is information that is necessary to explain the foundation of the expert's opinion in order to comprehend the opinion or if the limit could be understood more broadly as information that is relevant for a nonhearsay purpose—arguably any information that is helpful to assess the expert's opinion. As offered here, the excluded information is neither. *See McCathern*, 332 Or at 70 ("[W]e hold that the trial court did not err when it overruled Toyota's hearsay objections, because plaintiff offered the evidence of the details surrounding the 15 other rollover accidents only to provide the foundation necessary to explain [the expert's] opinions, not for its truth.").

information was offered as direct evidence, simply repeated by Reisberg, about a particular medical procedure that was the foundation for the conclusions of someone else. Thus, on the record before it at the OEC 104 hearing, the trial court correctly ruled that the details of the VCUG studies were inadmissible hearsay. *See Travis v. Unruh*, 66 Or App 562, 565, 674 P2d 1192, *rev den*, 297 Or 82 (1984) (OEC 703 does not permit experts to serve as a mere conduit for out-of-court authorities.). The trial court did not err in excluding the details of the VCUG studies under those circumstances.

## ADDITIONAL EVIDENCE OF BIAS

Defendant also argues that the trial court erred when it limited the testimony of a second expert, Dr. Wendy Bourg, a psychologist with clinical experience interviewing child abuse victims. She testified about the occurrence of children being influenced by adults and giving false reports of abuse. The trial court, however, foreclosed her testimony that would have commented on her impressions of potential signs of bias by ZM's interviewer at the Amani Center.

Earlier in the trial, the state had offered testimony of Sara Lindquist, the interviewer at the Amani Center. Lindquist had testified about the interview with ZM, reported his statements, and authenticated the videotape of the interview. On cross-examination, Lindquist recalled ZM's statement in the interview that his mother, Crosby, "[had] slapped him the Easter before the interview *** and two of his teeth came out *** but they grew back within the year and they were fine." Defendant asked if Lindquist believed that statement was true or if ZM was lying. Lindquist responded:

> "I believed it was unlikely that his teeth came out. *** Children do lie. However, they're not sophisticated liars. That was an example of how children can possibly put in some other thoughts, sort of fantastical things that are mixed in with the truth. However, there may have been quite a bit of truth to that. I didn't do an investigation on it."

Asked about any follow-up questions, Lindquist conceded that she did not pursue any questions about ZM's teeth falling out and growing back in time for the interview. Lindquist said that, when a child gives an "unbelievable answer," she

was supposed "to follow up with questions about why that's such an unbelievable answer." Lindquist admitted that she did not follow up with Crosby and that the victim's statement about his teeth did not give her "concerns at all about the overall truthfulness of the statements he was giving."

Defendant questioned Lindquist about ZM's reports of other physical abuse by Crosby. Again, Lindquist admitted that she did not follow up with Crosby or anyone else about ZM's allegations that Crosby had hit him with a light saber and left multiple marks on his head. Nor did she follow up with ZM's report that Crosby had choked him on the ground for five minutes. Lindquist testified that, although the Amani Center would usually send such reports to DHS and law enforcement to conduct an investigation into physical abuse allegations, she did not remember or believe that any report was sent to the authorities.

During trial, the court conducted a Rule 104 hearing to determine the admissibility of Bourg's testimony. In that hearing, Bourg testified that she had reviewed the Amani Center reports, its interview, police reports, and other records in order to provide her opinion about the quality of the Amani Center interview. Bourg believed, on the whole, that the Amani Center interview was conducted properly. Nonetheless, she noted an absence of follow-up questions that she believed that Lindquist should have asked ZM. Those were questions stemming from ZM's statements about Crosby's physical abuse of him. Bourg explained:

> "He talked about his teeth getting knocked out[.] *** [Y]ou want to remain vigilant during the interview of whether the child is remaining grounded in fact versus fantasy.

> "And when the child made a statement that was improbable about his teeth getting knocked out and growing back[,] *** [t]here wasn't an examination that happened, some follow up questioning about did that really happen, did anyone take you to the doctor, etc."

Referring to another statement, Bourg added:

> "He did talk about his mom hitting him with a light saber repeatedly and leaving marks on his body, and what

I noticed in the Amani Center report is that they didn't make recommendations about that. * * *

"And so if there's a disclosure of physical abuse, you're usually going to make specific recommendations about the physical abuse. So it raised a couple of hypotheses for me. Were they biased in favor of the mother and giving her a [bye] on things that might be, you know, going on with her or were they not believing this child when he said that the teeth were knocked out?

"And, if so, * * * what were their criteria for deciding which of his statements to believe and which of his statements not to believe given that he was talking about dramatic and low probability events throughout the evaluation."

Defendant proffered Bourg's testimony to show bias in the investigation in favor of ZM's mother, Crosby.[3] The state responded, in part, that the testimony elicited was duplicative, because Lindquist herself had already testified on cross-examination about ZM's statements and the lack of follow up.

Focusing on the investigation, as did defendant, the court responded that it did not see any relevance to Bourg's testimony regarding the Amani Center interview itself, especially because the center offered no opinion or diagnosis of child sex abuse. As for the bias of Lindquist as a trial witness, the court observed that defense counsel had already been "able to cross-examine the [Amani Center] interviewer on the issue of her belief as to whether or not [ZM's] teeth were knocked out" and that counsel was able to cross-examine the interviewer "on the issue of the mother's abuse." The court concluded that Bourg's assessment of the forensic interview was not relevant and precluded that aspect of Bourg's testimony.

On appeal, the parties repeat their arguments. We review questions of relevance under OEC 401 for legal error. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999).

---

[3] Bourg also testified that the Amani Center interview failed to ask what people had had conversations with ZM and what ZM's recollection of those conversations was. She suggested that the questions should have been asked in order to do "source monitoring" so as to "put a tag on" memory and recognize the source of the information.

We agree with defendant that the testimony about bias in the interview may have been relevant under OEC 401 and potentially admissible under OEC 609-1(1), but, we agree with the state that the court's ruling was correct, because the precluded aspect of Bourg's testimony was inadmissible under OEC 609-1(2).

In order for evidence to be admissible, it must be relevant. OEC 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. When the issue becomes the credibility of a witness, OEC 609-1 provides for admission and limitation on evidence. In two parts, the rule provides:

> "(1)   The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. ***

> "(2)   If a witness *fully admits the facts claimed to show the bias or interest of the witness, additional evidence of that bias or interest shall not be admitted.* If the witness denies or does not fully admit the facts claimed to show bias or interest, the party attacking the credibility of the witness may then offer evidence to prove those facts."

*Id.* (emphasis added). Under OEC 401 and OEC 609-1, evidence of a witness's bias is generally relevant and can be shown by, among other things, "statements or conduct indicating positive or negative feelings of the witness towards a party." *State v. Prange*, 247 Or App 254, 260, 268 P3d 749 (2011) (internal quotation marks omitted). To be relevant and admissible, "evidence introduced to impeach a witness for bias or interest need only have a mere tendency to show the bias or interest of the witness." *Id.* at 260-61 (internal quotation marks omitted). Consequently, trial courts must give "'wide latitude'" to the admission of bias evidence, particularly in criminal cases. *State v. Valle*, 255 Or App 805, 810, 298 P3d 1237 (2013) (quoting *State v. Hubbard*, 297 Or 789, 798, 688 P2d 1311 (1984)). That "wide latitude" for admission, however, does not apply to the admission of extrinsic evidence where the witness fully admits the facts claimed to show her bias. *See Hubbard*, 297 Or at 798. When

the facts that might show bias have already been fully admitted, extrinsic evidence "is inadmissible as a matter of law." *Id.* at 798 n 4.

Given OEC 609-1(1), the evidence of Lindquist's conduct in the interview might have been admissible as conduct that at least could have had a "mere tendency" to show the bias of Lindquist as a trial witness. Yet, insofar as the court also based its ruling on Lindquist's trial testimony and on defendant's ability to uncover prospective bias through cross-examination, we conclude that the evidence was correctly excluded under OEC 609-1(2). As noted, OEC 609-1(2) provides that, "[i]f a witness fully admits the facts claimed to show the bias or interest of the witness, additional evidence of that bias or interest shall not be admitted."

Lindquist had already fully admitted to the facts that defendant was attempting to offer through Bourg's testimony. On cross-examination, she admitted that she did not follow the procedures for follow-up questions about ZM's allegations about Crosby purportedly knocking out his teeth and reportedly hitting him with a light saber. Lindquist conceded that no report of the physical abuse allegations was filed with the authorities, despite that being the traditional procedure for such allegations of abuse. Because Lindquist had "fully admit[ted] the facts claimed to show the bias * * * of the witness," any additional, extrinsic evidence from Bourg was inadmissible as a matter of law. OEC 609-1(2); *see also Hubbard*, 297 Or at 798 n 4. The trial court did not err in limiting Bourg's testimony as to Lindquist's bias.

## CONCLUSION

We conclude that the trial court did not err in circumscribing the testimony of the two experts.

Affirmed.