Submitted November 5, reversed and remanded December 30, 2020

BUFORD THOMAS HARPER,
*Petitioner-Appellant,*

*v.*

Susan WASHBURN,
Superintendent,
Eastern Oregon Correctional Institution,
*Defendant-Respondent.*

Umatilla County Circuit Court
16CV32380; A170892

479 P3d 1101

Petitioner appeals from a judgment denying post-conviction relief for his claim that trial counsel was ineffective and inadequate for failing to ensure his guilty plea was knowing, intelligent, and voluntary. Petitioner alleges that the post-conviction court erred in permitting the superintendent to cross-examine petitioner on the differences between his original *pro se* petition for post-conviction relief and his later, attorney drafted, amended petition for post-conviction relief. Petitioner alleges this line of inquiry was irrelevant. The superintendent asserts that the questioning was permissible as impeachment for bias or self-interest and imputed petitioner's credibility. *Held*: Setting aside the question of whether an omission in a prior *pro se* legal document can ever be admissible to impeach an assertion in a subsequent attorney drafted legal document, the superintendent failed to establish the relationship between the proffered impeachment evidence and a fact of consequence as required to establish relevance of impeachment evidence. That evidentiary error was not harmless.

Reversed and remanded.

J. Burdette Pratt, Senior Judge.

Jedediah Peterson and O'Connor Weber LLC filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Colm Moore, Assistant Attorney General, filed the brief for respondent.

Before Lagesen, Presiding Judge, and James, Judge, and Haselton, Senior Judge.

JAMES, J.

Reversed and remanded.

**JAMES, J.**

Petitioner appeals from a judgment denying post-conviction relief for his claim that trial counsel was ineffective and inadequate for failing to ensure his guilty plea was knowing, intelligent, and voluntary. Petitioner alleges that the post-conviction court erred in permitting the superintendent to cross-examine petitioner on the differences between his original *pro se* petition for post-conviction relief and his later, attorney drafted, amended petition for post-conviction relief. Petitioner alleges that this line of inquiry was irrelevant. The superintendent asserts that the questioning was permissible as impeachment for bias or self-interest and imputed petitioner's credibility. We agree with petitioner, and, concluding that the evidentiary error is not harmless, we reverse.

Petitioner and four indicted coconspirators were each charged with felony murder following a premeditated and coordinated effort to commit a violent home invasion robbery in Douglas County. Petitioner and two of his codefendants confessed on video. The confessions were corroborated by independent evidence.

Petitioner was arrested for both a probation violation and the murder charges. He was incarcerated in the Douglas County Jail for approximately one year before he entered his plea and was sentenced. During that year, petitioner was moved between general population, administrative segregation, and isolation, based on his behavior, and spent approximately one-half of his incarceration in segregation or isolation.

Petitioner's jail records indicate that, when he was booked, petitioner mentioned dental pain and head pain, but his mental status screen was normal. Throughout that period of his incarceration, jail health records indicate that petitioner sought mental health services on three occasions, citing depressed mood, sleep disturbance, panic attacks, depressed appetite, headaches, anger control issues, and memory loss. Records also indicate that petitioner said he had "passed out a few times" and "sees things out of the corner of his eye."

The state offered petitioner a global plea deal pertaining to the three criminal cases he faced at the time: the murder case, an unrelated companion case based on petitioner's possession of a shank in jail, and a probation violation. On the murder case, the prosecutor offered petitioner a sentence of 25 years incarcerated with the Oregon Department of Corrections, which petitioner accepted and pleaded guilty as contemplated. At the plea and sentencing hearing, the state laid out the factual basis for the charges against petitioner, and through his attorney, petitioner indicated that he did not contest the state's recitation of the facts.

Following his conviction, in a *pro se* petition for post-conviction relief, petitioner asserted a single claim that essentially alleged a failure to investigate and interview witnesses by trial counsel. That *pro se* petition alleged that trial counsel

> "fail[ed] to question any of my list of witnesses and they would have testified to facts not presented at trial that could have severely lessened the alleged crime from murder to manslaughter. Had trial court counsel done so, the D.A. would not have continued with a murder trial and I would have proceeded to jury trial and a jury would have found me not guilty."

Petitioner also asserted that his trial counsel told him "time and again that [he] had no hope and should just wait and see what kind of deal [he] could get from the D.A."

Petitioner's appointed attorney subsequently filed an amended petition for post-conviction relief which substantially reframed petitioner's original *pro se* claim by asserting that trial counsel was ineffective in failing to ensure petitioner's plea was knowing, intelligent, and voluntary. In support of that reframed claim, the amended petition alleged that

> "Petitioner was suffering from severe psychiatric symptoms, including suicidal depression, insomnia, night terrors, panic attacks, memory loss and inability to eat. Petitioner's psychiatric symptoms significantly interfered with Petitioner's ability to knowingly, voluntarily, and intelligently waive his state and federal constitutional rights in pleading to the underlying criminal offense."

The amended petition alleged that trial counsel

"was objectively unreasonable, under then existing professional norms, in failing to comprehend the severity of Petitioner's psychiatric symptoms, failing to facilitate appropriate treatment, and allowing Petitioner to waive his state and federal constitutional rights when he was not mentally capable of a knowing, voluntary and intelligent waiver."

The amended petition further alleged that trial counsel was ineffective in failing to investigate, and appreciate the significance of, petitioner's substance abuse, and "post-concussional syndrome," in determining whether petitioner was capable of knowingly and intelligently entering a plea. Finally, the amended petition alleged that trial counsel was ineffective in failing to request a competence exam before advising petitioner to enter a plea.

In support of his claims, among other things, petitioner submitted a declaration asserting that he was "unable to comprehend the circumstances and consequences" of his guilty plea. Petitioner stated that he had pleaded guilty because he was suicidal, significantly impaired by controlled substances, suffering from post-concussional syndrome, and desperate to escape his isolation cell at the Douglas County Jail.

At the post-conviction trial, petitioner testified about the conditions of his confinement at the Douglas County Jail, including his time in administrative segregation or an isolation cell. He testified that, while in a segregation cell, he had no interaction with other inmates, little interaction with correctional officers, and was confined 23.5 hours per day. He further explained that these conditions made him feel suicidal. He spent his time reading, doing what "little exercise he could do in the cell," and talking to his "pet spider." He was allowed occasional 10-minute visits from his family, and, although the correctional officers provided him some recreational time in a chain-linked rooftop basketball court, unlike his fellow inmates, the correctional officers refused to remove his shackles.

On cross-examination, petitioner acknowledged that, after he pleaded guilty, he learned from his brother, who was a codefendant in his case, that his brother "got a deal" of 17 years for manslaughter. Petitioner also testified that he filed

his *pro se* petition because he thought that, if he had gone to trial, he would have been found "not guilty of murder and guilty of manslaughter." The superintendent's counsel then asked petitioner about his failure to mention in his *pro se* petition anything about his confinement in an isolation cell or his mental deterioration leading to suicidal thoughts:

> "[SUPERINTENDENT'S COUNSEL]: Okay. In that document, you never referenced anything about being in an isolation cell, did you?
>
> "[PETITIONER]: No. I didn't—no, not at all.
>
> "[SUPERINTENDENT'S COUNSEL]: In that first document, you didn't mention anything about Lieutenant Root, did you?
>
> "[PETITIONER]: No.
>
> "[SUPERINTENDENT'S COUNSEL]: In that document, you never referenced anything about being suicidal, correct?
>
> "[PETITIONER'S COUNSEL]: Your Honor, at this point I'm going to object. This is—this document has been replaced by the amended petition. It has no relevance in the proceeding today.
>
> "THE COURT: Mr. Cervera?
>
> "[SUPERINTENDENT'S COUNSEL]: I think it goes to impeachment and it goes towards motive for testifying falsely.
>
> "THE COURT: Overruled. I'll allow you to proceed.
>
> "[SUPERINTENDENT'S COUNSEL]: In that document, [petitioner], you never mentioned anything about being suicidal, correct?
>
> "[PETITIONER]: No.
>
> "[SUPERINTENDENT'S COUNSEL]: In that document, you never mentioned anything about talking to a pet spider, correct?
>
> "[PETITIONER]: No."

The court denied relief in a written judgment, explaining that petitioner had failed to prove that his trial counsel performed inadequately because the record did not

establish that his trial counsel could have or should have been aware of any mental health issue at the time of petitioner's guilty plea. The court also made explicit credibility findings, including a finding that petitioner's testimony was not credible:

> "I find the Petitioner's testimony to be not credible. Petitioner's testimony about his mental conditions is in conflict with the records of the Douglas County Jail. It is significant that Petitioner's original *pro se* petition makes no mention of mental health issues or his current claim that he did not knowingly, intelligently and voluntarily enter his guilty plea."

Petitioner timely filed a notice of appeal, and, in six assignments of error, he asserts one combined argument that the post-conviction court erred when it overruled his relevance objection. Specifically, he argues that, "[b]ecause a formal petition had been filed by counsel, the *pro se* petition was not operative and therefore irrelevant." The superintendent responds that that procedural fact does not make the *pro se* petition and its contents *irrelevant*, as distinct from legally operative. And, the superintendent asserts, under OEC 401, the objected-to evidence about the contents of petitioner's *pro se* petition "is relevant impeachment evidence."[1]

---

[1] Petitioner has never objected to the challenged evidence on the ground that it is not admissible under the specific evidentiary rules governing impeachment evidence, OEC 607 through 609, or otherwise argued that those rules are not satisfied. His argument has always been that the evidence is not relevant, and OEC 401 and OEC 402 are the only rules of evidence that he has invoked in his briefs to us. Accordingly, we do not address the applicability of OEC 607 through 609 to the issue before us, except to note that, when it comes to questions of the admissibility of evidence for impeachment purposes, parties would be well advised to engage with the specific evidentiary rules governing the topic, both in framing objections to the evidence and in arguing for its admission.

Evidence that undermines a witness's credibility comes in many forms, some more subtle than others. Such evidence may also blur the line between substantive evidence and impeachment evidence. For example, OEC 613 governs the admission of "[e]xtrinsic evidence of a prior inconsistent statement" of the witness. But, unlike the other provisions listed, OEC 613 makes no reference to the purpose of such evidence being to attack the credibility of the witness. As such, OEC 613 might be conceptualized as distinct from the impeachment sections explicitly referencing credibility, although conceptually it is clearly related. We do not foreclose the possibility that other forms of evidence beyond those specified in OEC 607 through 609 might carry impeachment implications, but nevertheless be governed by other sections of the evidence code. We need not explore those implications here, however, in light of the arguments advanced by the parties.

At trial in this case, the superintendent's articulated rationale for the admission of the evidence was that it went to "impeachment" and a "motive for testifying falsely." On appeal, the superintendent no longer argues that the evidence demonstrates that petitioner had a motive to lie in his testimony about having a mental illness, and we agree with the tacit acknowledgment that the evidence did not tend to show a motive to lie. The superintendent's theory of relevance is, instead, that it can be inferred from petitioner's mere omission from the *pro se* petition of any facts or claims regarding his mental competence that his later-asserted claims, and his testimony supporting them, are fabrications—a theory the superintendent terms "bias and self-interest" on appeal. Specifically, the superintendent argues:

> "Here, petitioner claimed that he received constitutionally inadequate assistance of trial counsel because, at the time of his plea agreement, he suffered from serious mental impairments that prevented him from knowingly and voluntarily entering his guilty plea. *** To counter petitioner's testimony, defendant pointed to evidence that petitioner's *pro se* petition made no mention of any mental incapacitation, nor did it suggest that his guilty plea was not made knowingly, voluntarily, and intelligently.

> "Evidence that petitioner failed to assert in his *pro se* petition that he suffered from mental incapacitation at the time of his guilty plea would allow a factfinder to reasonably infer that petitioner's testimony that he had been suffering from such incapacitation was not credible. *** [I]t is reasonable to infer that if petitioner's mental incapacitation had led him to unknowingly and involuntarily enter a guilty plea, he would have mentioned that circumstance or claim when he filed his *pro se* petition two years later."

Whether evidence is relevant is a question of law, which we review for errors of law. *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) (evidence is either "relevant or it is not"). Turning to the merits of that question, under OEC 401, "relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In terms of evidentiary

admissibility, that standard represents a "low bar," *State v. Davis*, 351 Or 35, 48, 261 P3d 1197 (2011), meaning that evidence is relevant so long as it increases or decreases—even slightly—the probability that a fact will be consequential to the determination of an action. *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000).

"Matters which would otherwise be irrelevant may be offered to show the bias or interest of a witness." *State v. Dowell*, 274 Or 547, 550, 547 P2d 619 (1976); *O'Harra v. Pundt*, 210 Or 533, 543, 310 P2d 1110 (1957). To be relevant, evidence introduced to impeach a witness for bias or interest need only have a mere tendency to show the bias or interest of the witness. Evidence of bias or interest relates to the credibility of the witness. It need not be relevant to another matter of consequence to the determination of the case. *State v. Shelly*, 212 Or App 65, 68, 157 P3d 234 (2007).

As Kirkpatrick notes, a wide range of evidence may show bias:

> "Bias may be evidenced by personal, family, romantic, sexual, or business relationships; by employment or termination of employment by a party; by statements or conduct indicating positive or negative feelings of the witness towards a party; by claims, litigation or settlements between the witness and a party; by prior fights or quarrels; by a party offering to give or a witness offering to receive a bribe; by payment of compensation of any nature by the party to the witness; by granting or promising to grant special advantage or favoritism; by a showing of a motive to curry favor with a party, such as showing that an agreement to grant immunity, recommend leniency, drop another charge or any other concession by a prosecutor or other law enforcement officer to a witness."

*State v. Brown*, 299 Or 143, 150, 699 P2d 1122 (1985) (quoting Laird C. Kirkpatrick, *Oregon Evidence* 263 (1982)).[2]

---

[2] Although the terms of OEC 609-1 could be read to limit the form of permissible impeachment evidence to the "conduct" or "statements" of a witness, the Supreme Court has held that the rule is not one of limitation: "OEC 609-1 *** was never intended to restrict other forms of impeachment for bias or interest. *** [F]riendship, family relationship, etc., and interest in the form of amount of expert witness fees, etc., continue to be viable forms of impeachment even though no conduct or statement is involved." *State v. Brown*, 299 Or 143, 150, 699 P2d 1122 (1985). But the court did not address omissions.

Despite the broad type of impeachment evidence permissible, it is not readily apparent that the evidence here qualifies. The superintendent's appellate theory of impeachment is that petitioner could be impeached by his failure to include mental health claims and facts in his prior petition—in essence, impeachment not through a statement, but the *absence of a statement*, or silence. But the superintendent has not supplied us with any authority holding that *silence* in a prior legal document is admissible to attack the credibility of subsequent legal assertions, or testimony in support of those legal assertions, and it is not clear how evidence taking such a form comports with the requirements of OEC 608 through 609.[3]

Regardless, setting aside the question of whether an omission in a prior legal document can ever be admissible to impeach an assertion in a subsequent legal document or testimony supporting the assertion, the superintendent in this case faces a fatal problem: The original pleading itself does not give rise to a reasonable inference about petitioner's credibility, and the state did not lay any additional foundation about the circumstances of that pleading that would allow such an inference to be drawn.

Although evidence of bias need only have a mere tendency to show the bias or interest of the witness, that

---

[3] Inconsistencies are a different story. In *Roop v. Parker Northwest Paving Co.*, we noted:

"'[W]here a complainant's pleading is subsequently abandoned or superseded, the original pleading is admissible as an evidentiary admission to refute or impeach the present pleading or testimony of the complainant, subject to the right of the complainant to explain any inconsistency.' *Swanson v. Hale*, 273 Or 138, 142, 539 P2d 1073 (1975); *see also Moore v. Drennan*, 269 Or 189, 193, 523 P2d 1250 (1974) (where the statements of fact in the plaintiff's prior pleadings were not consistent with the plaintiff's pleadings and testimony at trial, the prior pleadings were admissible in evidence and the plaintiff could introduce evidence to explain them); *MacDonald*, 133 Or App at 38-39 (it was error to exclude evidence of the defendant's original, and subsequently amended, admission that he did not give the plaintiff antibiotics before extracting her tooth; that evidence 'directly challenged [the defendant's] credibility' on a material fact in issue); *Southern Oregon Production Credit Assn v. Patridge*, 71 Or App 53, 56, 691 P2d 135 (1984) (superseded answer was not a binding judicial admission, but constituted evidence from which inferences could be drawn); Laird C. Kirkpatrick, *Oregon Evidence* § 801.03[4][d], Art VIII-33-34 (4th ed 2002)."

194 Or App 219, 254-55, 94 P3d 885 (2004) (brackets in *Roop*).

tendency must derive from permissible inferences. That is, even in the case of impeachment evidence, the proponent must establish the relationship between the proffered evidence (here, the pleading omission) and a fact of consequence (here, petitioner's truthfulness about his mental health). *See* OEC 401; *State v. Valle*, 255 Or App 805, 818, 298 P3d 1237 (2013) ("When determining whether a party has established that evidence is relevant, a trial court's task is to determine whether a jury could infer from the evidence the fact that the proponent is offering it to prove."). Moreover, as the proponent of the evidence, the superintendent bore the burden to "lay a sufficient foundation for the admission." *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984).

Here, to establish the relevancy of the proffered impeachment evidence, the superintendent's foundational showing needed to be sufficient to permit a reasonable, nonspeculative inference that petitioner's failure to include a mental health legal claim was purposeful—that is, the legal claim was omitted from the original pleading because petitioner did not, in fact, have concerns about his mental health at the time he filed it. The superintendent sought to impeach petitioner in two different ways, with two different documents—directly, through the absence of a mental health legal claim in the *pro se* petition—and indirectly, by suggesting that the inclusion of mental health legal claims in the amended petition was a falsity.

That proffered avenue of impeachment rests upon a faulty assumption about what can be inferred from the bare fact of the pleading omission in this case. Again, the superintendent is relying on an omission of a legal claim in the original pleading, which logically depends on an inference that petitioner would have known that such a claim was available, such that the failure to include a mental health legal claim was somehow telling as to petitioner's credibility. The superintendent did not attempt to lay any factual foundation about petitioner's knowledge of the availability and viability of the legal claims permissible. Instead, the superintendent appears to have relied on an assumption that petitioner would have possessed that legal knowledge to evaluate the adequacy of his counsel's performance and to allege a post-conviction claim on that basis. But a

presumptive knowledge of the law is different from actual knowledge, which is the predicate fact on which the superintendent's relevancy argument depends. *Cf. Gutale v. State of Oregon*, 364 Or 502, 511, 435 P3d 728 (2019) (explaining the difference between when a ground for relief is known and when a ground for relief "was reasonably available, despite not being known," and clarifying that precedent with regard to the latter question "*did not turn on a presumption that people know the law*" but on whether "the legal basis for the petitioner's claim was reasonably available to the petitioner" (emphasis added)).

Moreover, nothing in the foundational record established by the superintendent elevates that assumption—that petitioner knew, or reasonably should have known, the gamut of legal claims available—to the level of reasonable inference, as opposed to mere speculation. As we have observed before, the line between permissible inferences and impermissible speculation is "sometimes faint." *Hutchinson and Hutchinson*, 187 Or App 733, 741, 69 P3d 815 (2003). However, ultimately, reasonable inferences are permissible; speculation and guesswork are not. *State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004); *Lemons et al v. Holland et al*, 205 Or 163, 192, 284 P2d 1041 (1955) (holding same).

The speculative nature of the superintendent's assumption is underscored by the post-conviction statutory scheme, in which petitioners are granted counsel and given an opportunity to amend claims that may have been omitted from an original petition. That scheme belies the superintendent's broad assumption that all petitioners should be held to know all available claims at the time of the original petition. And there is nothing in the record to suggest that petitioner, in particular, knew or should have known the contours of a knowingly, voluntarily, and intelligently made plea agreement, such that it could be inferred that he naturally would have included the mental health claim if he actually had mental health problems.[4] And without the

---

[4] In ordinary civil litigation, particularly where a party is represented by counsel, the absence of a claim in an initial complaint might lead to a non-speculative inference that a party may have at least considered but did not initially include a claim that was later amended to the complaint. We do not face that circumstance or need to resolve that issue. Here, in contrast, the superintendent

predicate inference that petitioner knew the legal basis for such a claim, it is purely speculative to infer that the initial omission of allegations about mental health bore any relationship to petitioner's credibility. *Accord State v. Ogden*, 39 Or 195, 205-06, 65 P 449 (1901) ("If the questions so objected to were intended to lay the foundation to impeach the witness, they are insufficient for that purpose, because they do not purport to state any testimony given by her at the defendant's preliminary examination. *** [F]or the further reason that the omission to detail the facts on the prior occasion with greater particularity is not inconsistent with the testimony given by her at the trial. *Nor can such omission be regarded as a discrepancy in her testimony, unless it clearly appears that her attention was specially attracted and she was asked to testify concerning the very facts embraced in the questions propounded at the trial.*" (Emphasis added.)).

Finally, we address harm. We will not reverse based on evidentiary error unless that error affected the substantial rights of the parties. "Evidentiary error is not presumed prejudicial, and the burden is on [the party] who appeals *** to show that a court's error affected a substantial right." *State v. Kayfes*, 213 Or App 543, 555, 162 P3d 308, *rev den*, 343 Or 690 (2007); *State v. Ambriz-Arguello*, 285 Or App 583, 589, 397 P3d 547, *rev den*, 362 Or 39 (2017) (holding same). When analyzing whether an error is harmless, we consider whether there is little likelihood that the particular error would have affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

Here, we cannot conclude that there is little likelihood that the error affected the verdict. In announcing its verdict, the trial court made specific reference to petitioner's omissions, noting that was "significant that Petitioner's original *pro se* petition makes no mention of mental health issues or his current claim that he did not knowingly, intelligently and voluntarily enter his guilty plea." We take

relies on a number of faulty and speculative assumptions that an incarcerated, *pro se* petitioner would have been initially aware of the availability of a mental-health legal claim about the adequacy of his counsel that was later amended to the petition only when petitioner was represented by an attorney. The necessary chain of inferences is too speculative even under the low bar for the admission of relevant impeachment evidence.

the trial court on its word that this evidence was signifi-cant in its determination on whether to grant or deny post-conviction relief.

Reversed and remanded.