Argued and submitted September 16, 2020; decision of Court of Appeals affirmed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings May 20, 2021

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# DAMON JAMES NAUDAIN,
*Respondent on Review.*

(CC 080432001) (CA A160380) (SC S067229)

487 P3d 32

In a prosecution for aggravated murder, defendant, a Black man, sought to elicit information about a witness's potential racial bias on cross-examination. The witness had lived with the victim, was engaged to be married to him, and had a child with him. Defendant wanted to ask the witness questions that touched on the victim's racial prejudice, including his refusal to allow Black people in the home, arguing that the questions were relevant to show the witness's own bias. The trial court ruled that evidence of the victim's views was irrelevant and, in the alternative, inadmissible under OEC 403. Defendant was convicted of two counts of aggravated murder. The Court of Appeals reversed, concluding that the trial court erred because defendant's proffered evidence of bias was relevant and not unfairly prejudicial. *Held*: (1) The trial court erred in concluding that the evidence was irrelevant, as the proffered evidence bore a logical relationship to the witness's potential racial bias; and (2) the trial court erred in excluding the evidence under OEC 403 because, under the circumstances of this case, the probative value of the evidence was significant, while the risk of unfair prejudice was low.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Susan G. Howe, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

David O. Ferry, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the

_____
* On appeal from the Multnomah County Circuit Court, Thomas M. Ryan, Judge. 300 Or App 222, 452 P3d 970 (2019).

brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender.

Anna Belais and John Evans, Portland, filed the brief for *amicus curiae* Oregon Justice Resource Center.

GARRETT, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**GARRETT, J.**

In this aggravated murder case, the issue is whether the trial court erred by ruling that defendant, a Black man, could not pursue a line of questioning on cross-examination that was intended to show that the witness was racially biased against Black people. Defendant sought to ask about the witness's relationship with the victim, who was the witness's fiancé at the time and with whom the witness had a child and shared a home. Specifically, defendant wanted to ask questions that touched on the victim's racial prejudices and refusal to allow Black people in the home that the couple shared. The trial court granted the state's motion *in limine* to prevent such questioning, ruling that information about the victim's racial bias was not probative of the witness's own bias and, to the extent it had any relevance, it was unfairly prejudicial and inadmissible under OEC 403.

Defendant was convicted and appealed. The Court of Appeals reversed, holding that the trial court erred in its ruling on the evidentiary issue because defendant's proffered evidence of bias was relevant and not unfairly prejudicial. *State v. Naudain*, 300 Or App 222, 452 P3d 970 (2019) (*Naudain II*). We allowed the state's petition for review, and, for the reasons that follow, we affirm the decision of the Court of Appeals, reverse the judgment of the circuit court, and remand to the circuit court for further proceedings.

## I. BACKGROUND

The parties agree on most of the relevant facts. In 1998, defendant joined a group of people, including a white man named Michael Jump, in a robbery at the home of Jerry Hartman, a methamphetamine dealer. Hartman lived with his fiancé, Julie Beachell, and their infant son. When defendant and his associates arrived at the home, defendant knocked on the door and yelled "police." Jump then kicked in the front door, and defendant and Jump headed to the bedroom, where they expected to find a safe containing drugs and cash. Hartman, Beachell, and their baby were in the bedroom. Defendant asked Hartman where the drugs and money were, and someone hit Hartman. It is undisputed that defendant then shot and killed Hartman.

Defendant was charged with two counts of aggravated murder with a firearm. As explained in more detail below, the defense theory at trial was that defendant had accidentally fired the gun and lacked the requisite mental state for aggravated murder.

Defendant was tried in 2015.[1] At a pretrial hearing, the state informed the court that it planned to call Beachell as a witness. And, citing a police report that described certain statements made by Beachell to police, the state also moved to preclude defendant from questioning Beachell about Hartman's "opinions of African-Americans or his inclination to not have friends that were African-American."

A. *The Police Report*

According to the police report, Beachell had said that, when the two men entered the bedroom, the "male black subject immediately walked up to [Hartman,] and started asking him, 'Where the fuck is your money, where's the money.'" Then the "male black subject slugged [Hartman] and immediately asked him again, 'Where the fuck is the money.'" Beachell explained that, after being hit, Hartman fell back against a cupboard and, when he came "back off of the cupboard he sort of hunched over and the male black subject then shot him."[2] The police asked Beachell if it appeared that one person was in charge, and she explained that "she definitely thought the male black subject was in charge of what happened," and the "male white subject appeared to be very nervous and did not say much."

The police then asked Beachell whether she had any "male black" friends or acquaintances who had recently been to the home. Beachell explained that Hartman "did not associate with" and "did not like black people and would not allow them in his residence." Beachell went on to tell police about the couple's former housemate, a white woman

---

[1] This appeal arises from a retrial, after the Court of Appeals reversed and remanded defendant's first conviction for reasons that are not pertinent to the issue now on review. *See State v. Naudain*, 254 Or App 1, 292 P3d 623 (2012), *rev den*, 353 Or 788 (2013) (*Naudain I*).

[2] Although the police report indicated that Beachell said the "male black subject" shot Hartman, she testified at trial that, because her view was obstructed, she did not see the shooting of Hartman.

named Melissa Sparks, whom Beachell thought might have had something to do with the crime. Beachell explained that Sparks "liked to run with black people[] and hung around with black gangsters" and "had brought some male black subjects to the house in the past and they had tried to break in before." Beachell further explained that Sparks was "aware of how [Hartman] felt about black people, and knew that she was not supposed to bring black subjects to the residence" but "did not respect the rules of the house" and was asked to move out.

## B.  *Evidentiary Ruling*

As noted, the state made an oral motion at a pretrial hearing to preclude defendant from questioning Beachell about Hartman's "opinions of African-Americans or his inclination to not have friends that were African-American." Defendant opposed that motion, asserting that the evidence of what Beachell told police was relevant to whether Beachell herself had a racial bias. According to defendant, the fact that Beachell was engaged to and lived with someone who had strong racist views and would not allow Black people in the home suggested that she "at least [was] tolerant of those views or okay with them," which was relevant to show Beachell's own bias. Defendant argued that Beachell's racial bias was a potentially significant issue given her characterization of the "male Black subject" as the aggressor in an incident where the other perpetrator was white. Defendant indicated that he wished to use the evidence of Hartman's racist views to impeach Beachell through cross-examination; he did not intend to admit the police report.

In response, the state argued that none of the information cited by defendant suggested that Beachell herself had "any biases or prejudice against people of color." The state argued that the statements from the police report were not relevant because there was not a "logical connection" between Hartman's racial views and Beachell's potential bias; in the alternative, even if the evidence was relevant, it should be excluded under OEC 403 because it is "far more prejudicial than it is probative in this case."

The trial court then made the following comment:

"I don't think it's relevant that [Hartman] had *** the views described.

"But I think it is relevant if [Beachell] had those views. I don't think you can infer the adoption of those views. But I do think you can ask *** something along the lines of, did your fiancé have discriminatory views. And then did you adopt those views? Did you share those views?"

Defendant replied that that was the line of questioning he planned to pursue, and the state reiterated its objection. The state explained that it would be "one thing" if defendant wanted to ask the witness "do you have discriminatory views against Black people? Do you have—are you racist, or whatever, a question along those lines." In contrast, the state argued, asking about Hartman's views would tarnish the reputation of the victim while serving no relevant purpose. The state then noted that Beachell had not said or implied in the police report that she shared Hartman's racial views, which prompted the trial court to ask defendant's counsel if he had any evidence to the contrary. Counsel responded that he did not have direct evidence that Beachell shared Hartman's views, but that that was an inference that could be drawn from her statements to the police.

The trial court deferred ruling at the pretrial hearing and invited the parties to submit additional briefing. The state then filed a written motion *in limine* to exclude "hearsay evidence of deceased victim [] Hartman's racial bias." The state reiterated its position that, in the absence of an established link between Hartman's views and Beachell's, any inference of Beachell's bias would be impermissibly speculative. The state again emphasized that, other than Beachell's "association with [Hartman], no evidence ha[d] been produced indicating any racial bias by [] Beachell."

The state also reiterated its OEC 403 argument, reasoning that any probative value was low because, at the moment of the shooting, Beachell's view was obstructed and she did not actually see defendant fire the shot; thus, even assuming that she was racially biased against Black people,

the relevance of that fact would be "exceedingly low" as to the issue in dispute, which was whether defendant had the requisite *mens rea*. On the other hand, the state argued, the prejudice would be significant, given the "highly inflammatory effect an accusation of racism has to any witness."

In response, defendant argued that he intended to ask Beachell whether "she lived with a man who was racially biased and had a rule against African Americans being allowed in the house, and if she shared any of those sentiments in any way." According to defendant, evidence that Beachell agreed to live with and marry Hartman would permit an inference that Beachell shared his racial views, "or was at least willing to acquiesce to them." Thus, defendant argued, the proposed line of questioning was a permissible exploration of Beachell's possible prejudices as a reason why she described defendant in "more menacing terms" than the "male white subject" in her statements to police.

Following a second hearing, the trial court ruled:

"All right. I find that the proposed line of questioning is not relevant. It doesn't have any tendency to prove or disprove [a fact] that is of consequence to the determination of this case. It's not 609 material. If it had any probative value, and I don't think it does, I believe that probative value is substantially outweighed by its prejudicial impact. And I don't believe it's constitutionally required. So therefore, it will be excluded."

C.   *The Trial*

At trial, Beachell testified about the incident as follows. Two men—one Black and one white—entered the bedroom.[3] She was standing next to the bed holding the baby, and Hartman was standing on the other side of the bed. The white man approached her and pointed a gun, but she did not recall if he was speaking. "The Black guy went over [to Hartman] and was yelling for drugs and money," Hartman said he did not have any, and "the Black guy called him a fucking punk and hit him." At that point, Hartman lost his

---

[3] In her trial testimony, Beachell frequently described actions taken by "the Black guy" or "the Black man" when referring to defendant. When quoting her testimony, we use those terms.

balance and "the Black man" pointed a gun at his head. In a "very threatening" manner, "the Black guy" then ordered Hartman and Beachell to get on the floor. Beachell did so, then heard a gunshot. She looked up at the white man, whom she described as looking "shocked to see a baby there." She did not see the gunshot and could not see Hartman. "The Black man" then ordered her to "open the safe" in a "yelling," "angry," and "terrifying" tone. The white man also told Beachell to open the safe and grabbed her by the arm in a way that "didn't hurt" her, but "physically moved" her. Beachell opened the safe and someone took the contents. "The Black man" "yelled" "let's go, let's go."

Beachell further testified that "the Black guy" seemed to be "in charge" because "he was the one that was yelling and demanding and hit [Hartman] and told [her] to open the safe," and because he also seemed to be in charge of the exit strategy. When asked if "the Black male" told her not to worry and that he would not hurt her, she said he did not.

On cross-examination, defendant did not ask Beachell any questions related to her own racial views, Hartman's views of Black people, or a rule prohibiting Black people from entering the couple's house.

Defendant testified at trial and gave a different account of the incident. He testified that, when he entered the room, he pointed his gun at Hartman's feet and asked Hartman where the money and safe were. When Hartman did not answer, Jump "lunged" and hit him. As Hartman fell to the ground, defendant yelled "[s]tay down" and "[g]et your hand out from under the bed." At that point, he was confused, turned to look at Jump, and heard a "pop." He was in shock, did not recall pulling the trigger, and did not see where the bullet hit Hartman. However, defendant saw Jump turn to Beachell, so defendant told her he would not hurt her and asked her to open the safe. She did, and Jump took the contents. The group then left the house.

Defendant admitted that he shot Hartman, but he testified that he did so accidentally while looking at Jump. He theorized that, when Hartman was falling, Hartman

bumped his head on defendant's gun and defendant twitched in response, pulling the trigger.

Defendant's testimony that Jump, not defendant, was the one who hit Hartman before the shooting was corroborated by an investigator, who testified that Jump had told her that he was the one who struck Hartman.

The jury found defendant guilty of two counts of aggravated murder with a firearm. The trial court merged the two convictions.

D.   *The Court of Appeals Decision*

On appeal, defendant assigned error to the trial court's ruling on the state's motion *in limine*. The Court of Appeals first concluded, contrary to the trial court, that the proffered evidence of Hartman's bias was relevant to show Beachell's bias under OEC 401 because, given Hartman and Beachell's relationship and shared household, it was a reasonable inference that "Beachell tolerated Hartman's very negative racist views and agreed to abide by his rule about not allowing African-Americans in the house." *Naudain II*, 300 Or App at 232. The court then addressed the trial court's alternative rationale for granting the state's motion *in limine*—that, to the extent the evidence was relevant, any probative value was outweighed by the danger of unfair prejudice. *Id.* at 232-35. The Court of Appeals rejected that rationale, stating that the "relevant evidence of bias which defendant sought to introduce had no unfairly prejudicial effect." *Id.* at 233. The court explained that, contrary to the state's argument, a "'smear' against Hartman that he held racially biased views does not result in unfair prejudice" because the sole question at trial was whether defendant killed Hartman with the necessary *mens rea*. *Id.* at 234-35. Concluding that the trial court's error was not harmless, the court reversed and remanded the case to the trial court. *Id.* at 235.

The state petitioned for review, which we allowed.

## II.   DISCUSSION

On review, the state reprises the legal arguments it made below, challenging both relevance and the Court of

Appeals' rationale under OEC 403. The case before us thus poses two questions: (1) whether the proffered evidence of Beachell's bias that the trial court excluded was relevant; (2) if so, whether the trial court nonetheless permissibly excluded the evidence under OEC 403 on the ground that its probative value was substantially outweighed by the risk of unfair prejudice.

A. *Relevance*

Under OEC 402, "[a]ll relevant evidence is admissible." Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. Thus, relevance is a "'very low threshold' for the admission of evidence." *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) (quoting *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993)).

As this court has explained, a "principle of evidence law in Oregon is that[] it is always permissible to show the interest or bias of an adverse witness" because a witness's bias or interest is relevant to his or her credibility. *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984) (internal quotation marks omitted). Thus, a witness can be impeached with evidence of "conduct" or "statements" that are relevant to the witness's bias or interest. OEC 609-1(1).[4] To meet the test of relevance, bias or interest evidence "need only have a mere tendency to show the bias or interest of the witness." *Hubbard*, 297 Or at 796.

The Court of Appeals concluded that the evidence of Hartman's racial bias was relevant to Beachell's credibility because it tended to show that Beachell was racially biased against defendant. *Naudain II*, 300 Or App at 232. The court explained that, although it required "some inferences" to connect the evidence of Hartman's views to Beachell's possible bias, it was a "reasonable inference that, given their

_____

[4] OEC 609-1 was amended since the events giving rise to this criminal case. *See* Or Laws 1999, ch 100, § 1. However, because those amendments apply "to trials commenced on or after [October 23, 1999]," which included defendant's trial, the amendments are applicable here. *See id.* § 2. Accordingly, we cite the current version of OEC 609-1.

relationship and shared household, at a minimum, Beachell tolerated Hartman's very negative racist views and agreed to abide by his rule about not allowing African-Americans in the house." *Id.* From that, the jury could infer that the witness's testimony was less credible "because those views could have biased her perceptions of the actions of defendant, an African-American." *Id.*

On review, the state argues that the Court of Appeals erred because the "mere fact that a witness has an intimate relationship with someone who has a racial bias" is not a "logical basis" for inferring that the witness has the same bias.

The state is correct that relevance "requires a rational relationship between the evidence offered and the substantive issues properly provable in the case." *State v. Turnidge (S059155)*, 359 Or 364, 450, 374 P3d 853 (2016), *cert den*, ___ US ___, 137 S Ct 665 (2017) (internal quotation marks omitted). The rational relationship can be based on an inference, so long as the inference is a "logical connection." *Id.* "Evidence is relevant so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference." *Titus*, 328 Or at 481. We review determinations of relevance for errors of law. *Id.*

Here, the substantive issue to be proven was whether Beachell had a racial bias that affected the credibility of her testimony. Thus, the question is whether there is a rational relationship between that issue and the proffered evidence. Like the Court of Appeals, we conclude that there is.

Defendant sought to introduce evidence that Hartman had racist attitudes that manifested in a refusal to associate with Black people or to allow them in his home. The state does not dispute the general idea that that sort of evidence could be relevant to impeach the credibility of a *witness* who held those views. The state argues only that that evidence is not relevant to show the bias of someone else. According to the state, "[w]ithout an evidentiary nexus, the mere fact that a witness closely associates with someone who holds racist views is not evidence that the witness personally shares the same specific bias."

In many situations, evidence of one person's bias will have no rational relationship to the question of whether a different person is also biased, even if the two people are close associates. Here, however, the evidence that defendant sought to introduce showed that Hartman and Beachell were in the most intimate of relationships: they lived together, had a baby together, and were engaged to be married. It also showed that Hartman's views led to a rule regulating conduct in a house that Beachell shared. And finally, it showed that Beachell did not separate her own views from those of the "house" when she spoke about that rule: The police report reflects that Beachell brought up the house rule in response to the officer's seemingly innocuous question about whether "*she* had any male black friend or people that had been over to the house recently." (Emphasis added.) Beachell again brought up the house rule in recounting how Sparks was asked to leave because Sparks did not "respect the rules of the house," including the rule that prohibited Black people from entering the house. The evidence thus logically supports an inference that Beachell shared Hartman's racial bias at least to some degree. The evidence does not compel that inference, but it clears the low bar of demonstrating a rational relationship between the partners' views. Thus, the trial court erred in concluding that the evidence of Hartman's racial attitudes and practices was not relevant to the issue of Beachell's bias.

B.  *OEC 403 Balancing*

Having concluded that the evidence was relevant, we must consider whether the trial court erred by preventing defendant from using it as a basis to question Beachell. As noted above, the trial court determined that the evidence was irrelevant, and that, to the extent it had any probative value, that value was substantially outweighed by the risk of unfair prejudice.

While relevant evidence is generally admissible, a trial court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." OEC 403; *State v. Knight*,

343 Or 469, 483-84, 173 P3d 1210 (2007) (explaining that a court's exclusion of evidence under OEC 403 is an exercise of discretion).

In deciding whether to exclude evidence under OEC 403, a trial court should engage in four steps, the first step being assessing the proponent's need for the evidence. *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987). At that step, a trial court must "analyze the quantum of probative value of the evidence" by considering the weight or strength of the evidence and the alternative ways the proponent of the evidence could pursue the substantive issue it seeks to prove with the evidence in question. *Id.* at 645-46 (considering the alternative ways the state could have rehabilitated the witness). At the second step, "the trial judge must determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime." *Id.* at 645. The trial court then balances the need for the evidence against the danger of unfair prejudice. *Id.* Finally, the trial court must decide whether to admit or exclude the evidence. *Id.* A trial court's exclusion of evidence under OEC 403 is reviewed for abuse of discretion. *State v. Williams*, 313 Or 19, 29, 828 P2d 1006, *cert den*, 506 US 858 (1992).

Here, the Court of Appeals concluded that the trial court abused its discretion under OEC 403 because the proffered evidence "had no unfairly prejudicial effect." *Naudain II*, 300 Or App at 233-35. To the extent that that court reasoned that the evidence posed *no* danger of unfair prejudice, we disagree, for the reasons explained below. Nonetheless, we conclude that the danger of unfair prejudice was low under the circumstances of this case, and that the trial court could not permissibly find that that danger substantially outweighed the probative value of the evidence. Accordingly, we agree with the Court of Appeals' ultimate conclusion under OEC 403.

As noted above, the first factor to consider in the OEC 403 analysis is proponent's need for the evidence. Here, defendant sought to use the evidence to establish Beachell's bias. As we have discussed, although defendant's theory of bias would have required the jury to infer Beachell's bias

from indirect evidence, that is a permissible inference on this record. And such an inference, if drawn, would be valuable to the defense. Beachell's credibility was important to the state's case; she was a victim of the criminal conduct and, other than defendant, was the only eyewitness to testify about defendant's conduct immediately before Hartman was killed. And Beachell's testimony conflicted with other evidence on key points probative of defendant's *mens rea*—the only issue in dispute at trial. Beachell's characterization of defendant as the primary aggressor—including her testimony that defendant hit Hartman—supported a finding that defendant was acting intentionally when he pulled the trigger. However, that testimony was contradicted not only by defendant's testimony but by the investigator's testimony that Jump admitted being the one who hit Hartman. Those contradictions demonstrate that Beachell's recollection could have been mistaken. If defendant had been allowed to demonstrate that Beachell was biased against him based on his race, that could have led the jury to question the reliability of Beachell's testimony, in particular the aspects of her testimony that emphasized defendant's aggression in contrast to that of his white accomplice Jump. Thus, defendant's need for the evidence was significant.

The state suggests that defendant's need for the evidence was diminished because he could have elicited evidence of the same bias in other ways that did not implicate Hartman. Defendant disagrees with that suggestion, principally because he disagrees with the state about the scope of the trial court's order, and specifically about whether defendant would have been permitted to ask Beachell a question like "was there a rule prohibiting Black people from entering your home?" as long as the question did not directly mention Hartman.

In considering whether defendant had other meaningful opportunities to elicit evidence of Beachell's bias, we review the context of the trial court's ruling. As explained above, the state initially made an oral motion *in limine* to exclude evidence of Hartman's "opinions of African-Americans or his inclination to not have friends that were African-American." Defendant then said that he planned to

ask Beachell questions such as, "did your fiancé have discriminatory views?", "did you adopt those views?", and "[d]id you share those views?" The state responded that it would object to those questions but suggested that it would be permissible for defendant to ask Beachell whether she had "discriminatory views against Black people."

The trial court deferred ruling and invited briefing. The state then filed a written motion seeking to exclude "hearsay evidence of deceased victim [ ] Hartman's racial bias." In that motion, the state noted that, "[o]ther than her association with [Hartman], no evidence ha[d] been produced indicating any racial bias by [ ] Beachell."

In his own memorandum, defendant specified that he intended to ask Beachell whether "she lived with a man who was racially biased and had a rule against African Americans being allowed in the house, and if she shared any of those sentiments in any way."

Although the trial court ultimately ruled that "the proposed line of questioning is not relevant," the state contends that defendant still could have elicited evidence of Beachell's bias by asking her, without reference to Hartman, whether she willingly lived in a home that excluded Black people, whether Sparks was asked to move out because she did not follow the "house rules," and whether Beachell associated with Black people. At oral argument, the state acknowledged that "the record is cursory and the court's ruling is cursory" and that "a person could understand [the trial court's] ruling to be more expansive than it was." Still, according to the state, the questions it has identified on appeal would have been allowed.

We disagree. In support of its motion to exclude "hearsay evidence of deceased victim [ ] Hartman's racial bias," including that Hartman had a house rule that Black people were not allowed in his home, the state attacked defendant's theory of relevance, which was that, "by agreeing to marry a man with strong racial biases and living in a house in which there was a rule against African Americans being in the house, [ ] Beachell has engaged in conduct which could show bias." According to the state, that theory of relevance was meritless because there was no evidence that Beachell

shared Hartman's views. Notably, the state did not argue then what it argues now, which is that defendant could have asked Beachell, without mentioning Hartman, whether she lived in a home that excluded Black people. Rather, it is apparent that the state sought to exclude any questioning that was intended to urge an inference of Beachell's bias based on Hartman's racial attitudes and practices, including the fact that he refused to allow Black people in the house. The trial court granted the state's motion, finding that "the proposed line of questioning is not relevant."

With that context in mind, it is difficult to see how defendant would have understood at the time that he could ask Beachell whether she lived in a home that excluded Black people, or whether Sparks was asked to move out for violating the "house rules," as the state now says defendant could have done. Beachell's statements to police about Hartman in 1998 were the only source of information on that subject, and the jury had heard other evidence that Hartman and Beachell shared the home. Given that, and in light of the state's position below that evidence of Hartman's views and practices *including* his rule prohibiting Black people in the home was irrelevant—which the trial court appeared to accept—defendant likely would have seen any question about a race-based rule in the home as veering into the territory that the trial court had placed off limits. Defendant would reasonably have doubted that Beachell could provide truthful and contextually meaningful answers without alluding to Hartman's views, which the trial court had prohibited.

Some of the questions that the state now suggests were available might not have fallen within the scope of the trial court's orders. However, those suggestions do not represent serious alternatives to the line of questioning that defendant intended to pursue. The state suggests that defendant could have asked Beachell whether she had any Black friends or associates. But by the time of trial, defendant's only information on the subject was 17 years out of date; thus, the state effectively proposes that defendant should have asked Beachell "Did you have any Black friends or associates in 1998?"—at the risk of being unable to impeach a "yes" answer. And even an answer in the negative, standing

alone, would have done little to suggest racial bias of the kind disclosed by defendant's proposed line of questioning.

The state also argues that defendant could simply have asked Beachell directly whether she was biased against defendant because of his race. But such a question would have been of little use to defendant without the ability to impeach a "no" answer. Moreover, and especially because Beachell was not only a witness but also another victim of the crime, such a question would have carried the risk that the "jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness." *See Davis v. Alaska*, 415 US 308, 318, 94 S Ct 1105, 39 L Ed 2d 347 (1974). That alternative, therefore, did not diminish defendant's need for the evidence that he wished to present.

Having considered the probative value of the evidence, we now consider its potential for unfair prejudice. On this point, the Court of Appeals concluded that the evidence of Hartman's racism was not unfairly prejudicial to the state. *Naudain II*, 300 Or App at 233-35. In doing so, the court first rejected the state's argument that "asking if someone holds racist views will always raise a large specter of unfair prejudice because it is simply *too inflammatory* to even *ask* the question." *Id.* at 234 (emphasis in original). The court then concluded that, because "the sole question at trial was whether defendant killed Hartman with the necessary mental state," the chance that the evidence would show that Hartman had racist views "could not have damaged the state's case, either unfairly or fairly." *Id.* at 234-35.

"In the context of OEC 403, unfair prejudice does not mean that the evidence is harmful to the opponent's case—a central reason for offering evidence." *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996) (internal quotation marks omitted). Evidence is unfairly prejudicial when it has an "undue tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one." *Id.*

Here, the evidence that defendant sought to introduce would tend to impeach Beachell's credibility. Any prejudice to the state's case caused by simply demonstrating the

bias of its witness would not be "unfair" under OEC 403. The state has a stronger argument, however, that the evidence would unfairly prejudice the state's case by causing the jury to take a negative view of Hartman, thus implicating the risk that "the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence." *Lyons*, 324 Or at 280. Evidence that would cause the jury to develop antipathy toward the victim for reasons unrelated to the issues in dispute does present a risk of unfair prejudice, in that, as with other forms of character evidence, it "can detract from the factfinder's ability to neutrally and thoroughly assess the evidence in the case." *State v. Skillicorn*, 367 Or 464, 479, 479 P3d 254 (2021).

Thus, to the extent the Court of Appeals' analysis could be understood to mean that the proffered evidence posed *no* risk of unfair prejudice, we disagree. However, we believe the risk of unfair prejudice was not high under these circumstances. Defendant admitted to killing Hartman in his home, in front of his fiancé and infant child, and did not assert self-defense or argue that Hartman acted provocatively or aggressively in any fashion. As such, any negative views of Hartman based on his racial prejudice are unlikely to have seriously detracted from the jury's ability to resolve the sole question at trial, which was whether defendant acted with the necessary mental state for aggravated murder. Moreover, the exclusion of the evidence prevented defendant from exposing the facts necessary for the jury to draw inferences about Beachell's potential bias and, thereby, prevented defendant from making an initial showing of bias and impaired his right of effective cross-examination. *See Davis*, 415 US at 318 (by depriving the defendant of the opportunity to make a record from which to argue the witness's bias, the trial court denied the right of effective cross-examination, a "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it" (internal quotation marks omitted)).

In short, while the probative value of the evidence was significant, the risk of unfair prejudice was relatively low. OEC 403 permits exclusion of evidence only if its "probative value is substantially outweighed by the danger of

unfair prejudice." For the reasons we have explained, the trial court could not permissibly reach that conclusion here.[5]

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[5] The Court of Appeals also concluded that the trial court's error was not harmless. *Naudain II*, 300 Or App at 235. The state did not seek review of that issue and has not argued that the Court of Appeals' conclusion as to harmlessness was erroneous. As such, that issue is not before us and we do not consider it. *See* ORAP 9.20(2) (providing that the issues before this court ordinarily include "questions properly before the Court of Appeals that the petition or the response claims were erroneously decided by that court").