Argued and submitted January 26, reversed and remanded October 27, 2021

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## HUSSEIN IBRAHIM HASSAN,
aka Hussein Ibrahin Hassan,
aka Ibrahin Hussein,
*Defendant-Appellant.*

### Umatilla County Circuit Court
18CR57567; A170145

501 P3d 1096

Defendant was found guilty of two counts of first-degree sexual abuse committed against C, a child under the age of 14. On appeal, defendant argues that the trial court erred by instructing the jury that it could return nonunanimous verdicts and by excluding evidence relevant to C's possible motive to fabricate the allegations against him. *Held*: On the first count, defendant was found guilty by a nonunanimous jury, so the judgment was reversed and remanded as to that count in light of *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020). On the second count, the jury was unanimous, so any error in instructing the jury regarding unanimity or in receiving that verdict was harmless beyond a reasonable doubt and was not a basis for reversal. However, because the court erred in excluding evidence of C's possible motive to fabricate the abuse allegations, the judgment was reversed as to that count as well.

Reversed and remanded.

Jon S. Lieuallen, Judge.

Andrew D. Robinson, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

LAGESEN, P. J.

Reversed and remanded.

**LAGESEN, P. J.**

Defendant was found guilty of two counts of first-degree sexual abuse committed against C, a child under the age of 14, and the trial court merged the verdicts and entered a single conviction for first-degree sexual abuse. The first count alleged that defendant had touched C's breast, and he was found guilty by a nonunanimous jury of 10 to 2. The state concedes that, in light of the United States Supreme Court's subsequent decision in *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), the lack of unanimity requires us to reverse and remand as to that count. We agree. *State v. Ulery*, 366 Or 500, 464 P3d 1123 (2020).

The second count of sexual abuse alleged that defendant did "unlawfully and knowingly subject [C], a person under the age of 14 years, to sexual contact by touching her lips or mouth, a sexual or intimate part of [C]." The jury was unanimous as to that count, so any error in instructing the jury regarding unanimity or in receiving that verdict was harmless beyond a reasonable doubt and is not a basis for reversal. *See State v. Flores Ramos*, 367 Or 292, 334, 478 P3d 515 (2020) (holding that, as to unanimous guilty verdicts, "the trial court's instruction to the jury that it could return a nonunanimous verdict did not amount to a structural error and was harmless beyond a reasonable doubt").

However, with regard to that second count, defendant advances additional arguments as to why we must nonetheless reverse and remand, including that the trial court erred by excluding evidence relevant to C's possible motive to fabricate the allegations against him. We agree with defendant that the court erred in excluding the evidence, and we further conclude that the error was not harmless. Accordingly, for the reasons explained below, we also reverse and remand with regard to the guilty verdict on the second count.[1]

For purposes of framing the evidentiary issue before us, we begin with a brief overview of the circumstances leading to the charges against defendant. Defendant and C

---

[1] Defendant's remaining argument addresses an unpreserved claim of instructional error. We need not reach that issue.

lived in different halves of a duplex in Pilot Rock. Defendant lived on one side, and C, who was 13, lived on the other side with her stepmother and sister. The duplex shared a backyard. Defendant was an "amateur palm reader," and C had seen defendant read the palms of other people, including C's father and stepmother.

A neighbor who lived next to the duplex arrived home and encountered C in the driveway. C told the neighbor that she did not feel safe, because defendant had started reading her palm but then touched her breast. The neighbor asked C if she wanted to call someone and let C use her cell phone. C tried calling her stepmother and her father but was unable to reach them, so the neighbor drove C to her grandmother's house, which was five or six blocks away.

C's grandmother then reported the incident to police, and an officer arrived at the grandmother's home and interviewed C. C reported to the officer that, while in their shared backyard of the duplex, defendant wanted to see her painted nails, then gave her a palm reading, and then proceeded to kiss her on the lips and to touch her breast. She was later interviewed by a forensic evaluator at a child abuse intervention center and again reported that defendant had kissed her and touched her breast after taking her hand to read her palm.

Defendant was interviewed at the police station, and he repeatedly denied having kissed C or touched her breast. Defendant was then transported from Pilot Rock to jail in Pendleton and, on the way, engaged in additional discussion with an officer about his contact with C. Some of the statements he made at that point could be interpreted as incriminating but were far from unambiguous admissions of wrongdoing, in part because of a language barrier and in part because of the way in which the interrogation was conducted.[2]

_____

[2] For instance, defendant had the following exchange with the investigating officer:

"OFFICER BADAL: Just be honest about it though. You know you want to just say the truth. It makes you look better by being honest.

"THE DEFENDANT: I didn't kiss her sexually.

At trial, the state began its case-in-chief by calling C. She testified that, in the backyard of the duplex in Pilot Rock, defendant "was looking at my nail polish, and then he flipped my hand over and started reading my palm, and then he kissed me on the right side of my mouth, not necessarily my lips, but and then he grabbed my right breast." C further testified that the incident prompted her to move from Pilot Rock back to Pendleton where she had lived for "pretty much [her] whole life," because "we didn't feel safe at home anymore." She explained that, at the time of trial, she was living in Pendleton with her father, stepmother, and sister, but that she was continuing to attend school in Pilot Rock, where she had been for one year.

The state next called the neighbor to whom C reported the contact, and then the forensic evaluator who conducted the abuse assessment. During cross-examination of the forensic evaluator, defendant asked, "Now when you talked to the child, you learned that she was not living with mom because of what?" The prosecutor objected to that line of inquiry on the basis of relevance, and defendant responded, "Goes to bias."

The trial court then allowed defendant to pursue the line of questioning outside the presence of the jury, in order to determine whether to sustain the objection. Defendant asked the evaluator, "The child had told you that the reason that she was not living with mom [in Pendleton] was because of all—there were allegations of a theft, correct?" After the

---

"OFFICER BADAL: Okay then how did you kiss her? Was it like a goodbye or hello like we do in Middle Eastern?

"THE DEFENDANT: As a—

"OFFICER BADAL: At least okay was a goodbye kiss. Why couldn't you just tell the truth—tell the truth about that?

"THE DEFENDANT: I put my—my hand on her—in her (indiscernible).

"OFFICER BADAL: Okay you put her—your hand on her shoulder and then you kissed her right here?

"THE DEFENDANT: As you go back and I go into the bathroom to clean my nose.

"OFFICER BADAL: Okay so was it this side or this side?

"THE DEFENDANT: I didn't do it, believe it.

"OFFICER BADAL: You just said that you did though.

"THE DEFENDANT: I didn't do it."

evaluator responded affirmatively, defendant explained his theory of relevance:

> "So then the—what that goes to is if she got—had gotten in trouble because of a theft, and was being moved to a different location, *one way for a child to get out of trouble is to make a claim of sexual abuse and then she gets the attention of all the authorities, and the theft becomes much, much smaller.*"

(Emphasis added.) That is, defendant argued that it was relevant to his theory that C had fabricated the abuse allegations in order to get out of trouble with her parents—a theory that defendant intended to pursue by later calling C as part of his defense case.[3]

The court then sought clarification from the forensic evaluator about the circumstances of the phone incident, and the evaluator testified:

> "During the rapport building process as an interviewer I often ask about family, friends and things like that, and [C] had told me that she was not currently living with her mom because she had stolen—stolen something, and clearly it—it upset her, which I did not want to happen, so I quickly tried to transition out of that into the narrative recall part of the interview, so I didn't ask her any further questions."

After hearing that testimony, and after the prosecutor reiterated her relevance objection,[4] the court asked defendant to explain again how the evidence was relevant. Defendant repeated his argument that "it's relevant because *** if she was involved in stealing something, and if a child gets in trouble for doing something, one of the ways for them

---

[3] Defendant explained that statements from the evaluator would allow him to impeach C in the event that she denied the cell phone incident during her testimony. Although the trial court observed that defendant could simply choose not to dismiss the evaluator and recall her if necessary, the state does not advance any argument that admission of the extrinsic evidence would have been improper at that stage of the case, before C had testified on the issue.

[4] The prosecutor explained that her relevance objection had three components: (1) "there's no foundation *** that the theft occurred" and, in any event, it was "months before this event," (2) there was no basis for "the idea that she's making this a claim of sexual assault to cover up a stolen item," and (3) because the evaluator did not know the details of the phone incident, it could mislead the jury into "believing more is true than it's not."

to get out of trouble is to claim sexual abuse, and then they become a victim, and they get much more attention"—in other words, a theory that a child might deflect negative attention by falsely claiming to have been abused.

At that point, the court indicated that it was inclined to allow defendant to inquire about disharmony in the home, which would allow defendant to argue that C was looking to redirect attention away from herself:

> "I'm going to allow at least to inquire that there was more or less this—there was other I guess disharmony within the home, and I guess the issue here is the child could potentially be looking to—to redirect the attention away from herself onto something else. I'm not saying that happened, but I'm saying that—that can be an argument if there's facts to support that. I think it—it can go to that. So do you have a—with that being said, would you like this witness to be able to say that, or if not, we'll at least take the presentation of the evidence, or if you prefer it sounds like [defense counsel], we'll call your—your first witness back."

The prosecutor, however, continued to object on the ground that "just because two events are co-occurring doesn't mean that they're connected." The prosecutor acknowledged that the disharmony and ensuing change of C's living circumstances from Pendleton to Pilot Rock had occurred about a month before the abuse allegations, but the prosecutor argued that taking and misusing the phone was merely an internal family matter and that there was no basis for further inferring a connection between the family disharmony and later abuse allegations against defendant.

The court explained that defendant had laid "some foundation" for his theory that C wanted "to make the focus on something else other than herself and what had happened 30 days ago," which was an event that had "caused her to have to change, or caused a change in her living situation. She went from one parent or one place to another." However, because neither the prosecutor nor the evaluator could provide details on the phone incident or C's move from one household to another, the court had unanswered questions about what "the facts or circumstances were

surrounding and time frame, and what actually happened." So, at that point, C's mother was called to the stand for an offer of proof.

During that offer of proof, in response to questioning by defendant, C's mother testified that C and her brother "had taken a phone from our house and they were getting on social media, and keeping it from us," and that C was communicating with boys on the phone, which she had been forbidden to do. C's mother testified that C

> "was grounded for a month and she decided that she didn't want to listen to our punishment, and didn't want to do the work that I told her to do, and so we decided as a family that it was better for her to move in with her dad and step mom, and con—continue building a relationship with them, because she didn't want to listen to me."

According to C's mother, who had also remarried, the decision was made by both parents and stepparents and that C "went along with it" and had not objected.

When examined by the prosecutor, C's mother testified that C appeared upset when she was caught with the cell phone but that, after the grounding was over, she did not appear to be upset at all. In mother's view, the incident with the cell phone was no longer an issue after C changed homes: There was no further punishment by father, she continued to have contact with mother, and mother believed her to be "very happy actually" and that it "actually worked out very well."

Defendant then called C to the stand as part of an offer of proof. C testified that she was grounded after taking the cell phone and, when asked whether she was upset about that, responded, "Yeah I guess." C was asked whether "your custody changed or have there been different rules that you're going by," to which she answered, "No. My dad's more strict than my mom. That's the only other thing. That's the only thing."

After that offer of proof, the trial court sustained the prosecutor's relevance objection and concluded that it was "not going to allow the question or those answers." The court explained:

"I don't think there's sufficient relevance, relevance to that. She's not under any further restrictions, punishment at the time of the incident. While it may be 30 days, it'd come and gone. There was no further restrictions. There may have been lots of choppy stuff earlier some but [it had] all been worked out and smoothed out. She's under no further restrictions. I guess it doesn't appear [to] me there was anything to avoid at that time, and therefore no reason to make up, fabricate a story, anything of that nature, so.

"* * * * *

"* * * It was misappropriating the use of a family phone for things that were forbidden * * * and so there was some punishment for that. Ended up in a moving and then it stopped and he took a different course of conduct how he was going to deal with it. I think it was as said a fresh start, so there was nothing to avoid going forward, so anything else? So no—no more questions or information on that * * *."

The child-abuse evaluator then retook the witness stand, and the trial proceeded without any further discussion about the cell phone incident or C's subsequent change of residence.

During closing argument, the prosecutor directed the jury's attention to C's testimony, urging them to look at "the manner in which the witness has testified. You look at the nature or the quality of the witness's testimony. You look at evidence that contradicts the testimony of a witness, and you look at evidence concerning the bias, motives, or interests of the witness." The prosecutor started with the last one, arguing that C had nothing to gain from a false allegation:

"Let's start with that last one. I think it's fair to ask what—what does [C] gain from—if—if this were not true, what does she gain? Nothing. She gains nothing. What—what happened as a result of her disclosure? She told you. She had to move from her home because she didn't feel safe there, and then she had to testify in front of all of you, and you saw how easy a process that was for her, so not only did she have to testify for you because of questions that I ask, but then she got cross examined by the defense attorney, which was not pleasant for her, *so what—what bias, motive,*

*or interest was there? None except for her to be able to tell you all what the defendant did to her.*"

(Emphasis added.) The jury ultimately convicted defendant on both counts, unanimously with regard to Count 2, the charge based on kissing C on the lips or mouth.

On appeal, defendant assigns error to the trial court's exclusion of evidence regarding the circumstances surrounding C's taking of the phone and resulting move. Defendant argues, as he did below, that the evidence "could have given her a motive to fabricate the sexual abuse allegations in order to divert attention from her own malfeasance," and that the evidence met the low relevancy threshold for evidence related to credibility. The state responds that, after listening to the offer of proof, "the trial court correctly concluded that the cellphone incident had little effect on the victim by the time of the [charged] incident."

Under OEC 402, the general rule is that "[a]ll relevant evidence is admissible." Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. As the Supreme Court has repeatedly stated, "relevance is a very low threshold for the admission of evidence." *State v. Naudain*, 368 Or 140, 149, 487 P3d 32 (2021) (internal quotation marks and citation omitted).

It is a well-established principle of evidence law in Oregon that "'it is always permissible to show the interest or bias of an adverse witness' because a witness's bias or interest is relevant to his or her credibility." *Id*. at 150 (quoting *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984)). That principle encompasses a witness's motive to fabricate testimony or allegations against a criminal defendant.[5] *See State v. Valle*, 255 Or App 805, 815, 298 P3d 1237 (2013) (applying that rule in the context of "information that

---

[5] As we explained in *Harper v. Washburn*, 308 Or App 244, 249 n 1, 479 P3d 1101 (2020), "[e]vidence that undermines a witness's credibility comes in many forms, some more subtle than others," and "[s]uch evidence may also blur the line between substantive evidence and impeachment evidence." That is especially true where the evidence is directed not only at a witness's initial report of a crime but also the trial testimony that is consistent with that initial report.

was relevant to whether [the complainant] had a motive to fabricate her allegations against defendant"). It also has a constitutional dimension, as we explained in *Valle*: "[A] defendant in a criminal case *** has the right, under both the state and federal constitutions, to confront witnesses, a right that includes the right to question a witness about circumstances from which a jury could reasonably infer that the witness has a motive to testify in a certain manner." *Id*. at 810 (citing, among other sources, the Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon Constitution).

"To meet the test of relevance, bias or interest evidence 'need only have a mere tendency to show the bias or interest of the witness.'" *Naudain*, 368 Or at 149 (quoting *Hubbard*, 297 Or at 796). Although relevance "requires a rational relationship between the evidence offered and the substantive issues properly provable in the case," that "rational relationship can be based on an inference, so long as the inference is a logical connection." *Id*. at 150 (internal quotation marks and citation omitted). The inference need not be the most probable; rather, "[e]vidence is relevant so long as the inference desired by the proponent is reasonable, even if the evidence also could support a contradictory inference." *Id*. (internal quotation marks and citation omitted); *see Valle*, 255 Or App at 811 (holding that "it is error for a trial court to exclude evidence from which a jury could reasonably infer that the witness has a motive to testify in a certain manner"). We review a trial court's relevance determination for legal error. *Naudain*, 368 Or at 150.

Although defendant has consistently used the term "bias" to describe the theory by which the evidence of the cell phone incident was relevant to credibility, what he is actually describing appears to be closer to "interest"—that is, a personal interest on the part of C in making allegations and testifying in a certain way. *See generally State v. Barfield*, 79 Or App 688, 692, 720 P2d 394, 396 (1986) ("A witness is biased if the witness has a friendly or hostile feeling toward a party; a witness is interested if the witness has a stake in the outcome of the case."). Regardless of terminology, we understand defendant in substance to argue that a reasonable juror could infer from the evidence surrounding the cell phone incident

that C had a motive to fabricate allegations of abuse and testify falsely in accordance with those allegations.

The line between a reasonable inference and speculation is difficult to draw with precision, and we do not attempt to do so here. It is enough to say that "a factfinder's common knowledge can supply the bridge to a factfinder's reasonable inference," *State v. Hedgpeth*, 365 Or 724, 734, 452 P3d 948 (2019), and that the line between speculation and reasonable inference is drawn by the laws of logic; that does not mean that a reasonable inference must follow *necessarily* or in the form of a logical syllogism, but rather that it include principles of deduction or inference, *id*.

In this case, a reasonable juror could infer that the events involving the cell phone and subsequent move to Pilot Rock were sufficiently upsetting and life-altering for a young teenager that they supplied C with a motive to fabricate allegations of abuse at the Pilot Rock duplex. There is evidence in the record that C had spent almost all of her life in Pendleton; that she had been living there with her mother until the cell phone incident; and that the taking of the cell phone—and C's unwillingness to accept the punishment—were serious enough that she was required to move out of her home; and that, at the time of the abuse evaluation, C was still upset enough about those circumstances that the evaluator did not want to ask any further questions about the topic.[6] And, in fact, the allegations against defendant were stated as the reason that she then moved back to Pendleton (because her family no longer felt safe in Pilot Rock). Coupled with a juror's common knowledge that a child might sometimes lie to escape accountability or an uncomfortable situation, a reasonable juror could be persuaded on this record that the circumstances gave C such a motive in this case, even if that is not the most likely explanation for C's allegations.

The trial court's view—that C's move to her stepmother's house in Pilot Rock provided a fresh start, and hence there was no reason to fabricate abuse allegations—is

---

[6] Neither party has raised any issues regarding foundational evidence of relevance of C's motive to fabricate coming in through the forensic evaluator's testimony. We consider the evidence of C's contemporaneous statements to the evaluator to be part of the foundational evidence of relevance before the trial court.

unquestionably a reasonable view of the evidence in this record. However, it is not the *only* permissible view of that evidence. A juror would not be compelled to credit C's mother's testimony about how happy C was after the move. A juror could instead discount C's mother's testimony and draw a contrary inference from the circumstances—that the move from one house to another was not a fresh start but a very upsetting experience, one that was still fresh at the time of the abuse evaluation. Again, "the inference need not be the only one that could be drawn, or even the most probable." *Valle*, 255 Or App at 814. "At the admissibility stage, the only question is whether a jury could find that the witness has a motive to testify in a certain manner. Whether the witness actually has a motive and, if so, whether the motive has influenced the witness's testimony, are separate and subsequent questions for the jury." *Id.* Accordingly, as in *Valle*, we conclude that the trial court erred in excluding the evidence on the basis of relevance.

We further conclude that the error was not harmless. This case involved a credibility contest in which there was no physical evidence of abuse and no eyewitnesses who testified other than C. The evidence regarding the phone incident and subsequent move would have been defendant's *only* evidence of C's motive to fabricate the allegations, and he was denied the opportunity to advance that theory and to meet the prosecutor's closing argument that C had no bias, motive, or interest in falsely accusing defendant of abuse. *See id.* at 815 (holding that the exclusion of evidence relevant to a motive to fabricate allegations was "harmful because the jury was not fully informed of matters relevant to an assessment of [the accuser's] credibility, which was essential to the state's case"; throughout the case, the prosecutor emphasized that [the accuser] did not have a motive to fabricate; and the "exclusion of defendant's proffered impeachment evidence deprived defendant of an opportunity to meet that argument and deprived the jury of an opportunity to consider all of the information relevant to [the accuser's] credibility"). Accordingly, we reverse and remand the conviction on Count 2 as well.

Reversed and remanded.